IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In Re:  ELECTRICAL CARBON PRODUCTS ANTITRUST LITIGATION | MDL No. 1514 <br><br> Master Civil No. 03-2182 (JBS) <br><br> **OPINION** |

**APPEARANCES:**

### Plaintiffs' Class Counsel:

Steven A. Asher, Esquire
Weinstein Kitchenoff & Asher, LLC
1845 Market Street, Suite 1100
Philadelphia, PA  19103

Sandra A. Jeskie, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA  19103

Howard J. Sedran, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street
Philadelphia, PA  19106

Warren Rubin, Esquire
Law Office of Bernard Gross, PC
450 John Wanamaker Building
Juniper & Market Streets
Philadelphia, PA  19107

### Co-Liaison Counsel for Class Plaintiffs:

Lisa J. Rodriguez, Esquire
Trujillo Rodriguez & Richards, LLC
8 Kings Highway West
Haddonfield, NJ  08033

Allyn Z. Lite, Esquire
Lite DePalma Greenberg & Rivas, LLC
Two Gateway Center, 12th Floor
Newark, NJ  07102

### Counsel for Plaintiffs Emerson Electric Co., et al.:

Jerome A. Murphy, Esquire
Daniel A. Sasse, Esquire
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595

**Counsel for the Morgan Defendants:**
Robert M. Osgood, Esquire
Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498

**Counsel for the Carbone Defendants:**
Mary Ellen Hennessy, Esquire
Katten Muchin Rosenman, LLP
525 West Monroe Street, Suite 1900
Chicago, IL  606761-3693
                    AND
Jennifer Dufault James, Esquire
Harris Neal Feldman, Esquire
Schnader Harrison Segal & Lewis, LLP
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ  08002-1165

**Counsel for the Schunk Defendants:**
Matthew M. Neumeier, Esquire
Jenner & Block, LLP
One IBM Plaza
Chicago, IL  60611
          AND
Kerri E. Chewning, Esquire
Archer & Greiner, PC
One Centennial Square
P.O. Box 3000
Haddonfield, NJ  08033-0968

**Counsel for Defendant SGL Carbon:**
Jerome S. Fortinsky, Esquire
Shearman & Sterling, LLP
599 Lexington Avenue
New York, NY  10022
          AND
Michael J. Vassalotti, Esquire
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108

**SIMANDLE, District Judge:**

## I.   INTRODUCTION

Civil complaints alleging violations of the antitrust laws in connection with the sale of certain electrical carbon products in the United States were filed in various federal courts and transferred to this Court for coordinated proceedings through the Judicial Panel on Multidistrict Litigation.  Plaintiffs' Third Amended Class Action Complaint alleges that Defendants and their alleged co-conspirators engaged in an unlawful conspiracy to fix,

raise, maintain, and stabilize the price of, and/or allocate
markets and customers for, electrical carbon products[1] in the
United States in violation of Section 1 of the Sherman Act, 15
U.S.C. § 1.  Plaintiffs have sought certification of a class
consisting of:

>All persons and entities (excluding
>Federal government entities, Defendants and
>their respective parents, subsidiaries, and
>affiliates) who purchased Electrical Carbon
>Products in the United States, or from a
>facility located in the United States,
>directly from Defendants, their affiliates,
>subsidiaries, or alleged co-conspirators,
>during the period January 1, 1990 through
>December 31, 1999 (the "Class Period").

Plaintiffs' allegations followed an investigation and
criminal prosecutions by the United States Department of Justice
which led to Defendant Morganite, Inc. pleading guilty to
criminal charges of price-fixing with respect to various
electrical carbon products.  The Morgan Crucible Company PLC pled
guilty to attempting to influence the testimony of witnesses and
corruptly persuading a witness to destroy documents in connection

---

[1] "Electrical Carbon Products," for purposes of this case,
as defined in the Third Consolidated Amended Complaint, means:
"(1) carbon brushes used in consumer products, including
fractional horsepower brushes; (2) carbon brushes and current
collectors (including pantographs but excluding brush holders and
commutators) for automotive and traction-transit applications;
(3) carbon brushes used in battery-operated vehicles; and (4)
mechanical carbon products for use in pump and compressor
industries.  The term 'traction-transit applications' includes
railroad applications."

with the investigation into the price-fixing conspiracy.[2]  The European Community also investigated and levied fines upon various parties for anti-competitive practices of various Defendants for conduct in the European marketplace which is not part of this litigation or settlement.

This case is before the Court upon motions by Class Counsel to give final approval to certifying a Settlement Class pursuant to Rules 23(a) and 23(b)(3), Fed. R. Civ. P.; finding that the proposed Settlement Agreements are fair, reasonable, and adequate to the Settlement Class within Rule 23(e); dismissing all released claims; and approving payment of attorneys' fees, costs, and expenses, including incentive payments to various class representatives, from the common fund created by the Settlement Agreements.

## II.   **BACKGROUND AND PROCEDURAL HISTORY**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, this Court is called upon to review and approve, if fair, reasonable, and adequate, four proposed settlements between the class plaintiffs and the four groups of defendants.  The settlements would resolve this Multidistrict Litigation by

---

[2] Defendants F. Scott Brown, Robin D. Emerson, and Jacobus Johan Anton Kroef also pled guilty and were imprisoned for their interference with the federal investigation, while Defendant Ian P. Norris has been ordered extradited from the United Kingdom to face price-fixing conspiracy charges in the United States.

certifying a class of plaintiffs, to whom the proceeds of settlement would be distributed pro rata to those entities submitting verified claims of their purchases of the relevant products during the 1990-99 class period.  The settlement fund consists of $21.9 million reduced by attorneys' fees and expenses and incentive awards to class representatives as awarded by the Court from the common fund; the requested attorneys' fee award is approximately $5.7 million (approximately 26% of the common fund) plus expenses of almost $500,000.

These four defendant groupings and their settlement amounts are:

1.   The "Morgan Defendants":  The Morgan Crucible Company PLC; Morganite Industries, inc.; Morganite, Inc.; Morgan Advanced Materials and Technologies, Inc.; Morgan Electrical Carbon Ltd.; National Electrical Carbon Products, Inc. -- $15 million

2.   The "Carbone Defendants":  LeCarbone Lorraine, S.A.; Carbone Lorraine North America Corporation; and Carbone of America Industries Corporation -- $3.7 million

3.   The "Schunk Defendants":  Ludwig Schunk Stiftung E.V.; Schunk GmBH; Schunk Kohlenstoff-Technik GmBH; Schunk of North America, Inc.; Schunk Graphite Technology LLC; Hoffman and Co. Elektrokohle AG; and Hoffman Carbon, Inc. -- $2,975,000

4.   The "SGL Defendant":  SGL Carbon, LLC -- $225,000

The Court gave preliminary approval of the settlement classes and the proposed settlements on May 11, 2005, approving forms of notice and authorizing dissemination of class notice and

proofs of claim to potential class members.  The proposed
settlement fund for the original settlements was $24.2 million.

Shortly before the date for requesting final exclusion from
the class in 2005, 13 entities gave timely notice of their wish
to opt-out.  Twelve of the opt-out class members are large
companies represented by the Washington, D.C. law firm of Crowell
& Moring (the "Crowell & Moring" or "Opt-Out" Plaintiffs).[3]  Out
of the $600 million in purchases of electrical carbon products in
the United States at issue here, the Crowell & Moring Plaintiffs
had made a sizable share of purchases, totaling several hundred
million dollars.  The Crowell & Moring Plaintiffs' opting-out
triggered the walk-away rights under the Morgan, Schunk and
Carbone settlement agreements (while the SGL agreement has no
walk-away provision).[4]  Other than the Crowell & Moring

---

[3] The 12 Opt-Out Plaintiffs had also filed suit in the
Eastern District of Michigan encaptioned Emerson Electric Co. v.
The Morgan Crucible Company, PLC, which was transferred to this
Court through the Judicial Panel on Multidistrict Litigation and
is now docketed in this District as Civil Action No. 05-6042
(JBS).

[4] Under the proposed Morgan, Carbone, and Schunk
settlements, the Defendants were each free to terminate their
respective agreements at their option if the Opt-Outs' aggregate
dollar volume of purchases represents at least 10 percent, 20
percent, and 20 percent, respectively, of the dollar amount of
sales of Electrical Carbon Products in the United States from the
Morgan Defendants, the Carbone Defendants, and the Schunk
Defendants.  There was no dispute that the Opt-Out Plaintiffs'
aggregate dollar volumes of United States purchases exceeded
these termination thresholds for these respective settlements and
that Morgan, Carbone, and Schunk could have exercised the option
to terminate their settlements in their entireties.  See Morgan

Plaintiffs, only one entity opted out, leaving approximately 451 class member claimants.[5]

Class Counsel, joined by counsel for Morgan, Carbone, and Schunk, entered into discussions with the Crowell & Moring Plaintiffs to determine whether the latter would be willing to rejoin the Class and participate in the settlements.  Under Court supervision, these discussions led to agreements whereby the Crowell & Moring Plaintiffs requested to rejoin the Morgan, Schunk, and SGL settlements,[6] while they will not participate in the Carbone settlement.  The present Morgan, Schunk, and SGL settlements, including the Crowell & Moring Plaintiffs, are funded by the same contributions by the Morgan, Schunk, and SGL Defendants except that Class Counsel have agreed to reduce their request for attorneys' fees from 33 1/3% including costs and

_____

Settlement ¶ 29, Carbone Settlement ¶ 28, and Schunk Settlement ¶ 27.  Each of these settling defendants in fact announced the intention to withdraw from the proposed settlements because of the volume of purchases represented by the Crowell & Moring Plaintiffs.  If so, the litigation would have gone forward with no settlements at this time.

[5] The original notice was mailed by the claims administrator on June 27, 2005 to 4,887 entities.  (Aff. of Michael Hamer, Sept. 29, 2005.)  Through September 27, 2005, these mailings yielded the 13 requests for exclusion (including the 12 Crowell & Moring Plaintiffs and one from Precision Machining).  Id.  These mailings yielded 451 "Class Member Claimants" which submitted a Proof of Claim.  (Aff. of Michael Hamer, May 5, 2006 at ¶¶ 3-5.)

[6] Additionally, the Crowell & Moring Plaintiffs have entered into agreements with the Morgan, Schunk, and SGL Defendants relating to matters outside the scope of this class action.

expenses, to 25% of those settlement funds, not including costs
and expenses.  This concession by Class Counsel increased the net
value to the class of the Morgan, Schunk, and SGL settlements.

The initial Carbone settlement was renegotiated and amended
to preserve the settlement opportunity for the class member
claimants without the inclusion of the substantial Crowell &
Moring Plaintiffs' claims, by reducing the negotiated settlement
amount from $6 million to $3.7 million.  In exchange for that
reduction, the Carbone Defendants agreed not to exercise their
option to terminate their settlement with the class.[7]  Requested
attorneys' fees from the Carbone settlement fund remain capped at
33 1/3%, including costs and expenses.

Because these developments changed the original settlements,
the Court deemed it prudent to direct that a Supplemental Notice
be sent to all entities that had responded to the prior notice
(the 451 class member claimants and the one opt-out that was not
a Crowell & Moring Plaintiff) by Order filed March 27, 2006.  The
Court gave preliminary approval of the amended settlements and of
the Crowell & Moring Plaintiffs' application to withdraw their
opt-out notices and rejoin the class for the Morgan, Schunk, and
SGL settlements, subject to notice to all entities at interest to

---

[7] Thus, only the Crowell & Moring Plaintiffs' claims against
the Carbone Defendants will go forward in litigation, encaptioned
Emerson Electric Co. v. The Morgan Crucible Company, PLC, Civil
Action No. 05-6042 (JBS) (D.N.J.), while all other claims herein
are satisfied in the proposed settlements.

solicit any objections to the substance of the proposed amended settlements or to the decision to readmit the Crowell & Moring Plaintiffs to the Morgan, Schunk, and SGL class settlements.[8]

In response to the supplemental notice, no other party has opted-out and no objections to the settlements or to the requested attorneys' fees and costs have been lodged.[9]  As confirmed by the Claims Administrator, there have also been no objections to (a) the Amended Carbone Settlement; (b) any of the settlements with the Morgan, Carbone, Schunk, or SGL Defendants; (c) the Court's provisional ruling that the Crowell & Moring Plaintiffs, who had previously elected to exclude themselves from the Class, be permitted to rejoin the class and share in the settlements with the Morgan, Schunk, and SGL Defendants; (d) the Plan of Allocation; (e) the request for attorneys' fees and

---

[8] The Supplemental Notice informed the class members and the opt-out entities of the initial decision of the Crowell & Moring Plaintiffs to opt out of the settlements, the various agreements that were reached among the parties allowing the Crowell & Moring Plaintiffs to rejoin the Morgan, Schunk, and SGL class and participate in those settlements, the amended Carbone agreement, the reduction of the  fee request in the Morgan, Schunk, and SGL settlements, the right to object to the settlements, and the hearing for final approval, which was set for May 12, 2006.

[9] One entity, ThyssenKrupp Elevator, objected to its exclusion from the class definition by the claims administrator. The Court heard the objection de novo and denied it, finding this entity was not a purchaser of products fitting the definition of "Electrical Carbon Products," in an Order filed May 17, 2006.

expenses; or (f) the request for incentive awards to several
named class representatives.  (Hamer Aff. (May 5, 2006) at ¶ 6.)

### III.   REVIEW OF THE PROPOSED SETTLEMENTS

### A.   Certification of Settlement Class

It is apparent that this Settlement Class should be
certified under Rules 23(a) & (b)(3) for each of the four
proposed settlements.  The Settling Defendants have consented to
the certification of the described class and all putative class
members have received due notice.  The requirements for
certification under Rule 23 apply alike to a proposed settlement
class.  American Products, Inc. v. Windsor, 521 U.S. 591, 621
(1997).

The Settlement Class is so numerous -- over 4,000 customer
names appeared in discovery of records for the products at issue
-- that joinder of all members is impracticable, easily
satisfying Rule 23(a)(1).  There are questions of law and fact
common to the Settlement Class regarding price-fixing and
allocation of markets in alleged violation of Section 1 of the
Sherman Act, satisfying Rule 23(a)(2).[10]  The claims of the

---

[10] Consistent with Rule 23(c)(1)(B)'s requirement that the
order certifying a class shall "define the class and the class
claims, issues, or defenses," this Court must include "(1) a
readily discernible, clear, and precise statement of the
parameters defining the class or classes to be certified, and (2)
a readily discernible, clear, and complete list of the claims,
issues, or defenses to be treated on a class basis."  Wachtel v.

representative plaintiffs -- as pled in the Third Consolidated
Amended Complaint -- are typical of the claims of the Settlement
Class, as revealed in discovery from the proposed class
representatives, pursuant to Rule 23(a)(3).  The representative
plaintiffs -- represented by highly competent Class Counsel,
experienced in antitrust class actions -- will fairly and
adequately protect the interests of the Settlement Class,
satisfying Rule 23(a)(4).

It also appears that questions of law or fact common to the
members of the Settlement Class predominate over questions
affecting only individual class members; while individual class
members' purchases may have involved a plethora of different
electrical carbon products over the 10-year time period in sales
from one or more, but not necessarily all, of the alleged
conspirators, the questions of fact and law raised by the alleged
conduct of the conspirators transcend the individual
transactions.  It clearly appears that a class action is superior

---

Guardian Life Ins. Co. of Am., 453 F.3d 179, 187-88 (3d Cir.
2006).  The claims, issues, and defenses to be treated on a class
basis include:  (a) whether a conspiracy to fix or stabilize
prices of Electrical Carbon Products sold in the United States
existed during the years 1990-99; (b) what was the scope of such
a conspiracy? (c) what was the efficacy of such a conspiracy? (d)
when were the contours of such a conspiracy sufficiently known to
trigger the commencement of the statute of limitations?  Although
none of these issues must be adjudicated if the settlement class
is certified, these are included herein because the requirements
of Rule 23(c)(1)(B) would appear to apply equally to a stipulated
class settlement.

to other methods available for the fair and efficient
adjudication of the controversy, in compliance with Rule
23(b)(3).  Moreover, since these settlements will involve no
further adjudication, concerns about individual class members'
vagaries or atypicalities are greatly diminished, and the action
is manageable as a class action.

No member of the putative class objects to class
certification and all Class Counsel, representative plaintiffs,
and Settling Defendants specifically agree to Settlement Class
certification.  This Court, too, finds that the Settlement Class
as proposed, <u>supra</u>, shall be certified pursuant to Rule 23(b)(3),
with only one opt-out from all settlements and 12 opt-outs (the
Crowell & Moring Plaintiffs) from the Carbone settlement, as
identified in <u>Exhibit A</u> to the accompanying Final Judgment Order.

## B.   Permitting the 12 Crowell & Moring Plaintiffs to Rejoin the Morgan, Schunk, and SGL Settlements

As noted above, the 12 Crowell & Moring Plaintiffs had
timely exercised their right to opt out of all four settlements
after receiving notice in 2005, triggering the Defendants' rights
to withdraw from the Morgan, Carbone, and Schunk settlements
because of the dollar volume of sales represented by these 12
parties' purchases from these defendants.  (There was no such
provision in the much smaller SGL settlement agreement.)  After
negotiations between these 12 Crowell & Moring Plaintiffs and the

12

Morgan, Schunk, and SGL defendants, agreements were achieved relating to matters outside the scope of the class, including certain foreign purchases.  The Crowell & Moring Plaintiffs had a choice whether to seek to withdraw their opt-outs in some or all of the settlements, or to continue their civil action (Emerson Electric Co. v. The Morgan Crucible Company, PLC, supra) against some or all defendants.  Apparently, the terms of three of the available settlements (Morgan, Schunk, and SGL) were more desirable to the Crowell & Moring Plaintiffs than the prospects of litigating against these defendants, so that this group sought to opt back in to these settlements, while reaching the opposite conclusion as to the Carbone settlement.  The Morgan, Schunk and SGL Defendants consented to the Crowell & Moring Plaintiffs' application to opt back in to these proposed settlements.

When the Crowell & Moring Plaintiffs eventually sought to revoke their opt-outs and rejoin the Settlement Class as to Morgan, Schunk, and SGL Defendants, the Court granted provisional approval, subject to notice and an opportunity to object and be heard for the Class Claimants (i.e., those class members which had presented claims).  The Supplemental Notice thus clearly explained the circumstances under which the Court had preliminarily determined that allowing the Crowell & Moring Plaintiffs to withdraw their requests for exclusion from the Morgan, Schunk, and SGL settlements, and to participate in those

settlements, which allows those settlements to go forward without withdrawal therefrom by Defendants, was in the best interests of the Settlement Class. (See Supplemental Notice dated March 27, 2006 at 3,4.) Anybody wishing to object to this preliminary determination was informed of the right to do so (id. at 7) by submitting an objection by May 1, 2006. Copies of relevant documents were also available on the website for this case, www.ElectricalCarbonProductsLitigation.com. No objection was received, and none was voiced at the final hearing on May 12, 2006.

Where a putative class member has timely filed an opt-out notice, the rules are silent on the procedure to be followed when the party seeks to rejoin the class. In an analogous situation, we know from Rule 23(e)(4)(B), Fed. R. Civ. P., that court approval is required for the withdrawal of an objection to a proposed settlement. As explained in the Notes of the Advisory Committee (2003) when this provision was added, court review is more intense -- it "follows automatically" -- if the objections are withdrawn on terms that lead to modification of the settlement with the class. Id. There is "little need for further inquiry" by the court, on the other hand, if the objection being withdrawn had objected to settlement based on factors distinguishing the objector from other class members. Approval of the withdrawal may occur "without elaborate inquiry"

14

if the objections are surrendered on terms that do not affect the
class settlement or the objector's participation in it.  <u>Id.</u>  The
purpose of Rule 23(e)(4)(B), therefore, would seem to give the
court discretion to control the conditions upon which an
objection may be withdrawn to assure that the erstwhile objector
is not afforded an undue advantage or reward for tactics that
"augment the opportunity for obstruction or delay."  <u>Id.</u>  In the
present case, where the Crowell & Moring Plaintiffs, prior to
approval of a proposed settlement, seek to withdraw their prior
opt-out decision, the Court must scrutinize the decision to
assure that no special benefit is conferred upon them at the
expense of the other class members, and that the resulting
settlements are in the best interests of those class members.

The Court again determines that permitting the Crowell &
Moring Plaintiffs to rejoin the Morgan, Schunk, and SGL
settlements enables those settlements to go forward without these
Settling Defendants exercising their options to withdraw.  This
is in the best interests of the Settlement Class -- that there be
a fair and reasonable settlement including these parties rather
than no settlement at all -- nor is this opt-in unfair to all the
Class Claimants who had not opted out but submitted their claims
from the beginning.  It cannot be said that any class member
relied, to its detriment, on the Crowell & Moring Plaintiffs'
original decision to opt out, since that development was

15

contemporaneous with all other decisions and could not have been
a factor in the decision of any particular class member to
participate.  Second, since each of these three Settling
Defendants -- Morgan, Schunk, and SGL -- indicated they would
exercise their withdrawal options in the absence of the Crowell &
Moring Plaintiffs, there would literally have been no
settlements.  To say that the re-joinder of these 12 parties
dilutes the shares of the other participating class members, who
fully complied with the requirements for submitting claims, is a
misleading comparison since the true alternative for the class
members would be to have no prospect of settlement at all, the
Settling Defendants having exercised their options to withdraw.
Third, no special advantage is conferred upon the Crowell &
Moring Plaintiffs through this procedural development of opting
out and then opting back in.  Finally, these settlements, with
the Crowell & Moring Plaintiffs included, must still pass muster
and will be rejected if they fail to be adequate, reasonable, and
fair to the class members, as required by Rule 23(e), Fed. R.
Civ. P.

**C.**   **The Amended Carbone Settlement**

When it became clear that the Crowell & Moring Plaintiffs
would not participate in the Carbone settlement, the Carbone
Defendants could have withdrawn from the $6 million settlement,
and the Carbone Defendants advised the Court of their intention

to do so.  Class Counsel and the Carbone Defendants negotiated an amended settlement, reducing the payment to $3.7 million, with the Crowell & Moring Plaintiffs remaining outside.  The volume of purchases by the Crowell & Moring Plaintiffs from the Carbone Defendants was so large that the remaining class members, in achieving a $3.7 million settlement, are actually better off than they would have been with the Crowell & Moring Plaintiffs included at $6 million.  On a proportional basis, accounting for potential class members who will not be participating in the Carbone settlement, the amended Carbone Settlement is thus an increase over the initial Carbone settlement for each claimant's share.

When the Supplemental Notice of this reduction of the gross settlement value was given, and the reasons explained, no class member objected to the proposed amendment.  It would seem that the class membership, comprising mostly sophisticated businesses, uniformly decided not to object, signaling once again the reasonableness and fairness of this aspect of the amended Carbone settlement.

D.   **<u>Fairness, Reasonableness, and Adequacy of the Proposed Settlements</u>**

Prior to approving a settlement, the court must ensure that the terms of the settlements are "fair, reasonable and adequate." <u>In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab.</u>

17

<u>Litig.</u>, 55 F.3d 768, 785 (3d Cir.), <u>cert. denied</u>, 516 U.S. 824 (1995).[11]  It is the court's obligation to ensure that any settlement in a class action protects the interests of class members.  <u>Id.</u> at 784.

In the Third Circuit, courts traditionally considered a nine-factor test in evaluating whether a proposed class action settlement is fair, adequate and reasonable, enunciated in <u>Girsh v. Jepson</u>, 521 F.2d 153, 156-157 (3d Cir. 1975).  The <u>Girsh</u> factors include:

1.  The complexity, expense and likely duration of the litigation;
2.  The reaction of the class to the settlement;
3.  The stage of the proceeding and the amount of discovery completed;
4.  The risks of establishing liability;
5.  The risks of establishing damages;
6.  The risks of maintaining a class action through the trial;
7.  The ability of defendants to withstand a greater judgment;
8.  The range of reasonableness of the settlement fund in light of the best recovery; and
9.  The range of reasonableness of the settlement fund to a possible recovery

---

[11] <u>Accord</u>, <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 534 (3d Cir. 2004); <u>In re Cendant Corp. Securities Litig.</u>, 264 F.3d 201, 231 (3d Cir. 2001); <u>Eichenholtz v. Brennan</u>, 52 F.3d 478, 482 (3d Cir. 1995); <u>Walsh v. Great Atlantic & Pacific Tea Co.</u>, 726 F.2d 956, 965 (3d Cir. 1983).  This duty resides in Rule 23(3)(1)(C), which provides:  "The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable and adequate."

in light of all the attendant risks of
litigation.

Id.  The Girsh list is not exhaustive, and it has more recently

been reformulated to require consideration of other potentially

relevant and appropriate factors, as stated in In re The

Prudential Ins. Co. of Am., 148 F.3d 283, 323 (3d Cir. 1998)

[hereafter Prudential], as follows:

> [T]he maturity of the underlying substantive
> issues, as measured by the experience in
> adjudicating individual actions, the
> development of scientific knowledge, the
> extent of discovery on the merits, and other
> factors that bear on the ability to assess
> the probable outcome of a trial on the merits
> of liability and individual damages; the
> existence and probable outcome of claims by
> other classes and subclasses; the comparison
> between the results achieved by the
> settlement for individual class or subclass
> members and the results achieved -- or likely
> to be achieved -- for other claimants;
> whether class or subclass members are
> accorded the right to opt out of the
> settlement; whether any provisions for
> attorneys' fees are reasonable; and whether
> the procedure for processing individual
> claims under the settlement is fair and
> reasonable.

This court will address each of these considerations.


   1.  **Complexity, expense, likely duration**

     The "probable costs, in both time and money, of continued

litigation" must be assessed.  General Motors, 55 F.3d at 811

(quoting Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801

(3d Cir.), cert. denied, 419 U.S. 900 (1974)).  In the absence of

19

settlement here, complex legal and factual issues would remain to be litigated and adjudicated.  Conduct related to United States purchases by the plaintiff class extending back to 1990 would be explored through discovery, some of which would involve witnesses in Europe.  While some defendants have entered pleas of guilty to related criminal antitrust charges and the federal indictments would provide an outline to the plaintiffs, the discovery of admissible evidence to attempt to prove the antitrust allegations in this case could be quite onerous, expensive, and time-consuming.  Motion practice -- both dispositive and non-dispositive -- in these contested cases would also likely be time-consuming and tedious, given the range of possible issues to be raised under the antitrust laws.  The spectrum of electrical carbon products at issue, spread over a decade's time, would likely add to the legal and factual complexities if litigated fully.  The trial would, in all likelihood, lie several years down the road, with appeals by the losing side being likely and adding additional cost and delay before finality can be achieved.

These predictions in this antitrust case are hardly surprising.  It is especially in antitrust cases that the "legal and factual issues involved are always numerous and uncertain in outcome."  In re Motorsports Merchandise Antitrust Litig., 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000).

The costs associated with continuing this case would quickly mount.  The time expended by Plaintiffs' counsel already amounts to almost $5.9 million when calculated by the lodestar, and costs as of the final hearing date in May, 2006 were already over $490,000, according to the supplemental fee petition.  In any event, this factor weighs heavily in favor of approval of this settlement.

###### 2.   **Reaction of the Class to the Settlement**

The Class has had notice of the proposed Settlement Agreements in June of 2005, and supplemental notice in March of 2006, and no class member has objected to the settlements as being unreasonable, unfair, or insufficient.  Only one class member has opted out entirely, and the 12 Crowell and Moring plaintiffs opted out only from the Carbone settlement.  When given a second opportunity to object to the proposed settlements in May, 2006, no class member did so.  This weighs heavily in favor of the settlements.

###### 3.   **The stage of the proceedings and amount of discovery completed**.

This factor asks "whether counsel had an adequate appreciation of the merits of the case before negotiating." General Motors, 55 F.3d at 813; In re Cendant Corp. Litig., 264 F.3d 201, 235 (3d Cir. 2001) [hereafter Cendant].  Plaintiffs were enabled to obtain a working outline of defendants' alleged

conspiratorial activities through written discovery and the
exchange of transactional data, the receipt of 500,000 pages of
documents, and the receipt of information through cooperation of
the Carbone Defendants and the Schunk Defendants.   also retained
Dr. Raymond Hartman, an economist, as an expert witness, whose
review and analysis of the anti-competitive aspects of the case
were disclosed in his expert report and deposition.

Moreover, the settlements were achieved through arm's length
negotiations, ably assisted by Magistrate Judge Joel B. Rosen,
occurring between counsel highly experienced in federal antitrust
litigation and settlement processes. General Motors, 55 F.3d at
785.  Where this negotiation process follows meaningful
discovery, the maturity and correctness of the settlement become
all the more apparent.  In re Linerboard Litig., 292 F. Supp. 2d
631, 640 (E.D.Pa. 2003).  Moreover, all counsel had the
opportunity during the reopened negotiations (from November 2005
to March 2006) to make a re-appraisal of their positions in light
of developments in achieving the present settlements.  That there
was this opportunity for sober reflection upon the proposed
compromises also enhances confidence in the substantive results.

Accordingly, this factor again favors approval.

### 4.   Risks of establishing liability

Plaintiffs have candidly recognized several hurdles to be
jumped before liability could be established if the case went

forward.  The defendants would have opposed class certification based on the diversity of products and purchasing practices, and because various Electrical Carbon Products are custom-manufactured from proprietary materials.  The statute of limitations presents another potential barrier, requiring factual proof of defendants' fraudulent concealment of the scheme and Plaintiffs' due diligence in investigating suspicious circumstances or "storm warnings" of a price-fixing conspiracy at an early date, as recognized in this Court's Opinion filed August 27, 2004 at 27 (denying motions to substantially reduce the class period due to the statute of limitations, but providing that the issue may be revisited after conclusion of discovery).

Thus, one must evaluate the potential risks and rewards of litigation had Class Counsel decided to litigate the claims rather than to accept the settlement offers.  Cendant, 264 F.3d at 237; General Motors, 55 F.3d at 814.

As in any antitrust case, this one presents substantial risks of non-recovery, even after preliminary victories were achieved.  See, e.g., In re Brand Names Prescription Drug Antitrust Litig., 186 F.2d 780 (7th Cir. 1999) (plaintiffs succeeded in having summary judgment against them reversed on the issue of conspiracy, but then failed to prove their case at trial); In re Carbon Dioxide Industry Antitrust Litig., 229 F.3d

23

1321 (11th Cir. 2000) (class claims settled before trial, then opt-outs did not prevail before trial jury).

These uncertainties suggest that success is far from a given if these claims went to trial, and there is also a prospect that the time period for liability may be greatly reduced due to the operation of the statute of limitations.  Moreover, even though the evidence of the price-fixing scheme may be strong and several criminal convictions have occurred, the potential difficulties of proving it with admissible evidence at trial should not be overlooked.  All things considered, the uncertainties of recovery also demonstrate the wisdom of avoiding the risk of no recovery through a prudent settlement.

**5.   Risks of establishing damages**

It is hard to pinpoint the damages that may be recoverable if the class were certified and successful on its claims.  Yet, the Court is called upon to measure the expected value of litigating the action rather than settling it at the current time.  General Motors, 55 F.3d at 816.

Reluctantly, a rough calculation of maximum damages follows. In this case, about $600 million in sales of Electrical Carbon Products by these defendants took place during the class period. If one assumes that products that were custom-made, or otherwise the result of arm's length negotiations of price, are eliminated from consideration for present purposes, and that the products at

issue are reduced by one-third,[12] the total scope of purchases is $400 million.  If an illegal 10% price premium is assumed,[13] the damages would be $40 million.  This figure is trebled under the Sherman Act, 15 U.S.C. § 1, to become a $120 million recovery.  The present settlements, totaling $21.9 million, represent over 18% of the maximum treble-damage recovery under the above assumptions, and about 55% of the maximum single damage recovery.

Whether Plaintiffs can make such a robust damages showing at trial will also depend on a battle of experts addressing the measurement of such overcharges, which can become an esoteric exercise with unpredictable results.  Cendant, 264 F.3d at 239.

The present settlements recognize the problems inherent in proving antitrust damages in a reasonable, balanced way.

### 6.    Risks of maintaining the class through trial

Plaintiffs' counsel have also recognized a risk of decertification of a class before trial in the absence of a settlement.  They point out that the Settling Defendants would be

---

[12] There is no hard data yet to support this assumption.  It is realistic to assume that there would be shrinkage of the products at issue due to these factors, as well as subtracting the substantial purchases made by the Crowell & Moring Plaintiffs from the Carbone defendants due to their opt-out from that settlement.

[13] Again, this is a rough assumption of the maximum extent of price elevation caused by the antitrust conspiracy; although developments could alter this figure, no one has suggested a larger premium than this 10% figure.

likely to raise decertification motions if the class is certified, due to the diversity of products, product approval procedures, and pricing mechanisms which would make a class unmanageable.  See <u>Cendant</u>, 264 F.3d at 239.  The proposed settlements are desirable for the class by eliminating the risk of decertification.

>   **7.   <u>Ability to withstand a greater judgment</u>**

If Plaintiffs do not settle and if they achieve a robust verdict, would the Defendants withstand such a judgment?  There is no evidence currently to answer this question, and the Court would assume that a larger judgment would not lie beyond the financial capabilities of the Defendants.  This presents a neutral factor due to the present lack of knowledge.

>   **8.   <u>Range of reasonableness of settlement fund compared with best recovery and a possible recovery in light of attendant risks</u>**

These final two <u>Girsh</u> factors require the Court, in assessing the reasonableness of the proposed settlements, to assess "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing," compared with the amount of the proposed settlement.  <u>Prudential</u>, 148 F.3d at 322 (quoting <u>General Motors</u>, 55 F.3d at 806).

In this analysis, the Court has the benefit of the claims submitted by the claimants (as to all class purchases) and by the Crowell & Moring Plaintiffs (as to purchases from Morgan, Schunk and SGL Defendants).

Under the proposed settlements and the amount of claims filed by the Class Plaintiffs, together with the Crowell & Moring Plaintiffs' purchases from Morgan, Schunk, and SGL Defendants, according to Class Counsel, the Class Plaintiffs who submitted valid claims can expect to receive (subject to verification of their claims) a gross recovery, before attorneys' fees and costs, of approximately 12-15% of their purchases of Electrical Carbon Products from the Settling Defendants. (Supp. Mem. of Plaintiffs' Class Counsel at 4.)  To the extent any claims are invalid, the percentage recovery for the remaining valid claims will be higher.  A gross recovery of 12-15% would be the equivalent of a treble damage recovery upon antitrust damages of 4-5% of the total class purchases.  In other words, if the class succeeded at trial in proving that the prices they paid for Electrical Carbon Products averaged 4-5% higher due to Defendants' anticompetitive conduct, and that such damages would be trebled, then this proposal could be said to be the rough equivalent of a full recovery.  If, as the Class Plaintiffs' proposed expert has opined preliminarily, the anticompetitive conduct resulted in elevating the prices by 8-10%, rather than 4-

27

5%, then this proposed settlement represents about one-half of the optimum full recovery for that hypothesis.

If one discounts these figures for the risk of non-recovery, this settlement appears to be even more impressive. If we assume there is a 50/50 chance[14] of non-recovery, and that this settlement will likely pay 12-15% of the Class's purchase amounts, then this settlement represents the rough equivalent of one-half of a treble damage recovery upon an overcharge of 10% of the purchase prices, which is Plaintiffs' proposed expert's optimum figure, as noted above. Thus, if we assume for this purpose a hypothetical risk of non-recovery of 50%, the Class Claimants are very wise to accept this settlement, because it would represent the present optimal expectation of recovering damages for a 10% elevation in purchase price on all eligible purchases. By this measure, the proposed settlement (12% to 15% purchase price) is an excellent result for the Class Claimants when compared with the proffered range of antitrust harm (5% to

---

[14] This assumption of a 50/50 chance of non-recovery is for illustrative purposes. No one is capable of computing this figure with certainty because no one can foresee all the strengths and weaknesses of the case, the procedural and substantive rulings, courtroom developments at trial, and the jury's reaction to the evidence. This assumption, though hypothetical, may be reasonable due to possible shrinkage of claims between allegations and proofs, the chance that some claims would be barred by the statute of limitations, the prospect that some transactions may not be shown to be the product of unlawful pricing strategies, and the like.

10% of purchase price), a hypothetical 50% risk of non-recovery, and the trebling of damages under the Sherman Act.

### 9.   Consideration of other factors under *Prudential*

As noted above, the Girsh factors were never meant to be exhaustive, and in any event were reformulated in Prudential, 148 F.3d at 323.  The Prudential considerations have largely been addressed above because of their overlap with the Girsh factors. Several Prudential considerations have no direct applicability here, such as "the experience in adjudicating individual actions, [and] the development of scientific knowledge."  Prudential, 148 F.3d at 323.  Likewise, this Court is unaware of "the existence and probable outcome of claims by other classes and subclasses." Id.

To the extent that the Crowell & Moring Plaintiffs will be litigating against the Carbone Defendants in the Emerson case, there is a set of other claimants whose results "likely to be achieved" must be assessed.  Since the Emerson case is at a preliminary stage,[15] there is no firmer basis for predicting its likely outcome than that already reflected for the class claimants.  Obviously, these opt-out plaintiffs assess their

---

[15] In late July, 2006, the Carbone Defendants in Emerson filed various motions for dismissal, including lack of in personam jurisdiction over Defendant Le Carbone Lorraine, S.A., the barring of pre-1998 federal claims under the statute of limitations, and the dismissal of state law counts for failure to state a claim.

chances of recovery against the Carbone defendants as greater through litigation than through the proposed settlement, while the Carbone defendants disagreed with their assessment.

The Prudential considerations also include whether the settlement's provisions for attorneys' fees are reasonable. Id. The requested attorneys' fees for the class in the Morgan, Schunk & SGL settlements were reduced from 33 1/3%, including costs and expenses, to 25% of the settlement funds not including costs and expenses. For the Carbone settlement, the requested attorneys' fees and expenses remained at 33 1/3% of the Carbone settlement fund, including costs and expenses. Overall, the requested fees are about 26% of the overall settlement fund, not including costs. The proposed settlements all require court review of the applications for fees, costs, and expenses, based upon detailed records of counsel's time and services rendered on a daily, detailed basis. The Class received notice of the original fee requests and the reduced fee requests, and the Class has had the opportunity to review the fee applications (and all other documents referred to in the Notices to Class) on the website, at the Clerk's Office, or upon request to Class Counsel. Furthermore, Class Counsel have submitted a brief and supplemental brief explaining and supporting their fee request, accompanied by the voluminous affidavits of counsel. This is a fair and reasonable procedure for protecting the interests of the

30

Class and assuring that any eventual fee award from the
settlement funds is well justified and tailored to the legal
services performed and risks undertaken in the circumstances of
this case.  That no objection has been received regarding the
requested attorneys' fees, costs, or expenses is further evidence
of the reasonableness of the fee applications themselves, which
will be considered in greater detail momentarily below.

Finally, the <u>Prudential</u> considerations include assessing
"whether the procedure for processing individual claims under the
settlement is fair and reasonable."  <u>Id.</u>  The formation and
administration of the qualified settlement funds will remain
under the continuing jurisdiction of this Court.  Claimants
completed their Proof of Claim forms under penalty of perjury and
submitted them to the Claims Administrator, Heffler, Radetich &
Saitta, LLP, in Philadelphia.  The Net Settlement Fund (after
court-approved attorneys fees, incentive awards to class
representatives, and tax payments) will be distributed pro rata
to all Claimants based solely upon their direct purchases of
Electrical Carbon Products in the United States, or from a
facility located in the United States, from Settling Defendants
during the period from January 1, 1990 through December 31, 1999.
The Claims Administrator will review, determine, and audit the
Claims Forms and make its recommendations to the Court of the
amounts to be paid to the Claimants.  The distributions will

occur as soon as practicable after court approval of the amounts
to be paid.  (See Notice and Supplemental Notice Regarding
Proposed Settlements at 6.)  Again, this method of determining
the amounts of claims and for their payment strikes this Court as
eminently reasonable and fair to the class members.

### 10. **Conclusion**

Having considered all <u>Girsh</u> factors and the <u>Prudential</u>
considerations, this Court finds, pursuant to Rule 23(e)(1)(C),
Fed. R. Civ. P., that each of the four proposed settlements is
fair, reasonable, and adequate and each will be approved as
indicated in the accompanying Final Judgment Order Approving
Settlements with all Named Defendants.

### IV.  **REVIEW OF ATTORNEYS' FEES, COSTS, AND EXPENSES TO BE PAID FROM COMMON FUND**

Consistent with the proposed settlement agreements, Class
Counsel ask this Court to approve an award of attorneys' fees
amounting to 25% of the gross settlement funds in the Morgan,
Schunk, and SGL Settlements, plus reimbursement of litigation
costs and expenses.  The award sought in the Carbone class
settlement is 33 1/3% of the gross settlement funds <u>including</u>
costs and expenses.  Thus, the Carbone award is a slightly higher
percentage of the recovery than the Morgan-Schunk-SGL award.  The
overall fee request amounts to 26% of the overall settlement

fund.  The total attorneys' fees requested is $5,700,003.10 plus interest[16] and the total costs and expenses requested is $493,078.17.  The attorneys' fee lodestar for all plaintiffs' counsel comes to a total of $5,860,512.75, based upon hourly rates in effect in 2003.  (Class Counsel agreed to waive increases in hourly rates occurring after 2003 when this litigation was commenced; the actual lodestar amount would be considerably higher if based on counsel's 2006 hourly rates.)

Thus the total attorneys' fee request of $5.7 million is about 26% of the total settlement fund of $21.9 million, and it is about 97% of the claimed lodestar amount of $5.86 million.

When an award of attorneys' fees and nontaxable costs is sought in a class action pursuant to Rule 23(h), Fed. R. Civ. P., the Court must find the facts and state its conclusions of law on the motion, as required by Rule 23(h)(3), Fed. R. Civ. P.  This Opinion constitutes the Court's findings of fact and conclusions of law.

This, of course, is a common fund case, with the fee awarded to be determined according to the percentage-of-recovery method, which applies a certain percentage to the settlement fund.  See In re AT&T Corp. Sec. Litig., 455 F.3d 160, 164 (3d Cir. 2006);

---

[16] Counsel seek a proportionate share of the interest earned upon the settlement funds.  The funds had earned interest of $349,718.22 as of April 30, 2006, as reported by Class Counsel at the hearing on May 12, 2006.

In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 732 n.10 (3d
Cir. 2001) [hereafter Cendant PRIDES].  The percentage-of-
recovery method is finally favored because "it allows courts to
award fees from the fund 'in a manner that rewards counsel for
success and penalizes it for failure.'"  In re AT&T, 455 F.3d at
164 (quoting In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300
(3d Cir. 2005)), (quoting In re The Prudential Ins. Co. of Am.,
148 F.3d 283, 333 (3d Cir. 1998)).  The lodestar method, which
multiplies the number of hours class counsel worked by a
reasonable hourly billing rate for such services, is used as a
cross-check on the reasonableness of the percentage-of-recovery
award.  In re AT&T Corp. Sec. Litig., 455 F.3d at 164; Rite Aid,
356 F.3d at 305; Prudential, 148 F.3d at 333.  This Court will
first examine the factors influencing the percentage-of-recovery
award from the common fund, and it will momentarily perform the
lodestar analysis cross-check.

A.   **Percentage-of-Recovery Analysis**

     In the antitrust context, the class counsel performs a
private attorney general's function by seeking to enforce the
antitrust laws by civil litigation.  See Hawaii v. Standard Oil
Co., 405 U.S. 251, 267 (1972); Minnesota Mining & Mfg. Co. v. New
Jersey Wood Finishing Co., 381 U.S. 311, 318 (1965); Alpine
Pharmacy, Inc. v. Chas. Pfizer & Co., Inc., 481 F.2d 1045, 1050
(2d Cir.), cert. denied, 414 U.S. 1092 (1973).  It has been

34

recognized that awarding payment of attorneys' fees from the common fund created through the efforts of counsel fosters class actions and encourages skilled counsel to represent class action plaintiffs seeking redress.  See Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 338 (1980).  Ultimately, the percentage-of-recovery is favored in common fund cases because it allows courts to award fees from the fund determined by a certain percentage that reflects the success obtained.  Rite Aid, 396 F.3d at 299.

In the Third Circuit, the factors to be considered when analyzing a fee award in a common fund case include:

> (1)   the size of the fund created and number of persons benefitted;
>
> (2)   the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
>
> (3)   the skill and efficiency of the attorneys involved;
>
> (4)   the complexity and duration of the litigation;
>
> (5)   the risk of nonpayment;
>
> (6)   the amount of time devoted to the case by plaintiffs' counsel; and
>
> (7)   the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000), quoted in Rite Aid, 396 F.3d at 301, and In re AT&T Corp. Sec. Litig., 455 F.3d at 165.  Beyond these Gunter factors, the Third Circuit has noted three other factors to consider, namely:

(1)   the value of benefits accruing to class
      members attributable to the efforts of
      class counsel as opposed to the efforts
      of other groups, such as government
      agencies conducting investigations,
      <u>Prudential</u>, 148 F. 3d at 338;

(2)   the percentage fee that would have been
      negotiated had the case been subject to
      a private contingent fee agreement at
      the time counsel was retained, <u>id.</u> at
      340; and

(3)   any "innovative" terms of settlement,
      <u>id.</u> at 339.

<u>In re AT&T Corp. Sec. Litig.</u>, 455 F.3d at 165.  Because the Third

Circuit recognizes "'an especially acute need for close judicial

scrutiny of fee arrangements' in class action settlements,"

<u>Cendant PRIDES</u>, 243 F.3d at 730 (quoting <u>General Motors</u>, 55 F.3d

at 820), the district court is called upon to "engage in robust

assessments of the fee award reasonableness factors."  <u>Rite Aid</u>,

396 F.3d at 302, <u>quoted in In re AT&T Corp. Sec. Litig.</u>, 455

F.3d at 166.  While the Court has the duty to protect the

interests of the class members against an unreasonable fee award,

it also has the duty to determine a reasonable percentage-of-

recovery award commensurate with the efforts of class counsel in

producing this settlement fund.  Where, as in the present case,

no objection to Class Counsel's fee application has been

received, the Court makes these determinations without the

benefit of the adversary process.  Indeed, the lack of opposition

to the proposed settlements and fee requests is a strong factor

favoring approval, especially in a case where the class members
are generally sophisticated companies and regional or national
transportation agencies.  With this background in mind, and
recognizing that some of the same ground was covered above in
discussing several of the <u>Girsh</u> factors applicable to the
approval of the proposed settlements, the Court will give
explicit consideration to the <u>Gunter</u> factors and the
<u>Prudential/AT&T</u> factors mentioned above.

### 1.   <u>Size of fund created and number benefitting</u>

The total fund created from these four settlements is
$21,900,000, representing over 3% of class members' purchases in
the United States during the class period.  Approximately 5,000
class members were mailed copies of the Class Notice.  There are
approximately 451 Class claimants, plus the 12 Crowell & Moring
Plaintiffs which have been allowed to opt-in to the final Morgan,
Schunk and SGL settlements, as discussed in Parts II and III.B,
above.  Class Counsel were instrumental in negotiating, and
renegotiating, settlements creating a substantial fund for the
class of plaintiffs which had the wide majority of sales.

### 2.   <u>Absence of objections to settlement terms or fees requested by counsel</u>

There are no objections from class members to the proposed
settlements or to the requested attorneys' fees, costs and
expenses.  While the 12 Crowell & Moring Plaintiffs opted out of

the Carbone settlement, no remaining class member has objected to the reduced Carbone settlement or to the attorneys' fee request of 33 1/3% of the common fund in Carbone inclusive of costs and expenses.  The absence of objections to a fee request, or the imposition of minimal objections, is seen as an indicator that the fee request is fair.  See Cendant, 264 F.3d at 235; Rite Aid, 396 F.3d at 305 (two objections out of 300,000 class members was a "rare phenomenon").

### 3.   Skill and efficiency of the attorneys involved

Class Counsel and Liaison Counsel demonstrated the skills and effectiveness which come from seasoning and experience in class action litigation, and more particularly in antitrust cases.  In this case, the Court observed Class Counsel closely and found them to be well-prepared, knowledgeable, industrious, fair with opposing counsel, and unfailingly candid with the Court.  Class Counsel were successful in defeating dispositive motions challenging the complaint, and in persuading the Morgan defendants to withdraw their jurisdictional dismissal motion, and in obtaining early and complete court-ordered discovery describing defendants' various meetings and communications with competitors.  Counsel devised successful settlement strategies including the obtaining of early promises of cooperation by various defendants against others.  Plaintiffs' counsel appeared,

38

in all respects, to be a good match with defendants' various
excellent counsel.

Counsel's skill was especially reflected by the delicate
renegotiations of the Morgan, Schunk and Carbone settlements when
the respective settling defendants had the right, and indeed the
intent, to withdraw because of the Crowell & Moring Plaintiffs'
opt-outs, as discussed in note 4, supra, and accompanying text.
These negotiations, after it may have appeared that the proposed
settlements were lost, proceeded simultaneously on three fronts.
Special efforts were needed to evaluate the new Carbone
settlement for the class, absent the Crowell & Moring Plaintiffs.

In short, Class Counsel's skills and effectiveness in
preparing, litigating, strategizing, and successfully resolving
the case with a fair settlement were of the highest order of
professionalism.

### 4.   __Complexity and duration of the litigation__

This complex antitrust case was actively litigated from its
inception as more than two dozen different cases in multiple
federal district courts three years ago.  As in many such cases,
the issues are numerous, the circumstances are complex, and the
outcome is uncertain, as explained above in Parts III.D.1 & 3.
The substantive and procedural difficulties were numerous and
would lie beyond the abilities and resources of less capable
counsel.  That the litigation, when undertaken, could proceed for

many years until finality also meant that counsel assumed a clear risk of long-delayed payment for efforts and reimbursement for expenditures, warranting recognition of such risk when awarding fees.

### 5.   **The risk of nonpayment**

The risks of establishing liability and damages were examined in Parts III.D.4 & 5, above.  Similarly, the risks of holding the class together, if certified at all, were addressed in Part III.D.6, above.  The results obtained by Class Counsel in these settlements, for the benefit of the class, when considering the uncertainties of recovery, again support a substantial fee award.

### 6.   **The amount of time devoted to the case by plaintiffs' counsel**

The requested attorneys' fees, if awarded, would not amount to conferring some undeserved windfall on Plaintiffs' counsel. To the contrary, as discussed in more detail in Part IV.A.9, below, Plaintiffs' counsel devoted many thousands of hours to the tasks of this case.  Counsel's efforts have increased beyond original expectations when the new round of difficult settlement negotiations ensued, and counsel will continue, in the future, to administer the claim payment system.  That the requested percentage-of-recovery award is roughly equivalent to the

lodestar amount further attests to the reasonableness of the requested fees.

### 7.  <u>The awards in similar cases</u>

The fee sought here is about 26% of the common fund, not including expenses.  Nationally, according to the <u>Manual for Complex Litigation 4th</u> [hereinafter "MCL 4th"], § 14.121 at 188 (2004), the range of attorneys' fees awarded from a common fund is "often between 25% and 30% of the fund." (Citing Thomas E. Willging, Laurel L. Hooper & Robert Niemic, <u>Empirical Study of Class Actions in Four Federal District Courts:  Final Report to the Advisory Committee on Civil Rules</u>, 69, 146-47 (Federal Judicial Center 1996)).  "Awarding attorneys 25% of a common fund represents a typical benchmark," MCL 4th, § 14.121 at 188, but the use of a single benchmark would be arbitrary and misleading in the individual case, over-compensating counsel where the recovery in a "mega-case" is huge, <u>Prudential</u>, 148 F.3d at 339-40 (6.7% may be excessive in light of magnitude of recovery), or where the risk of non-recovery was small.  MCL 4th § 14.121 at 188 (citing <u>FJC Empirical Study of Class Actions</u>, <u>supra</u>, at 60).  In the Third Circuit, benchmarks are rejected and the more qualitative standards are required, <u>Cendant PRIDES</u>, 243 F.3d at 736-37, of which a comparison of the requested fee and that in other similar cases is but one factor to consider.  Thus, in <u>Cendant PRIDES</u>, the Third Circuit cautioned that the court may

not rely on a formulaic application of the appropriate percentage range, but must consider all relevant circumstances.  Id.

More recently, the Third Circuit in AT&T Corp. Sec. Litig., 455 F.3d at 172, cited to studies examining the awards made in settlements where the settlement fund exceeded $100 million, noting that for settlements in that high range, the average fee award is 15.1%, while the average award in all cases was 18.4%. (Citing Stuart J. Logan, Jack Moshman, and Beverly C. Moore, Jr., "Attorney Fee Awards in Common Fund Class Actions," 24 Class Action Rep. 169 (2003)).  In AT&T Corp. Sec. Litig., the Third Circuit found that an award of fees of 21.25% of a $100 million settlement fund was not excessive, based on a negotiated upward-increasing sliding fee scale.  455 F.3d at 173.

The present case is not a $100 million case, so the typically lower percentage recovery in such cases is not probative here.  Plaintiffs' counsel have identified many recent common fund antitrust cases within the Third Circuit awarding fees greater than are claimed here.  See, e.g., In re Automotive Refinishing Paint Antitrust Litig., MDL Docket No. 1426 (E.D. Pa. Oct 13, 2004) (allowing fee award of 32% of $66.75 million settlement fund); In re Flat Glass Antitrust Litig., MDL No. 1200 (W.D. Pa. May 28, 2003) (awarding 33% of settlement fund); In re Linerboard Antitrust Litig., 2004 WL 1221350, at *19 (awarding 30% of the settlement fund).  Results in antitrust cases in other

42

districts are similar.  See e.g., Vitamins Antitrust Litig., MDL
No. 1285, 2001 WL 34312839 (D.D.C. July 16, 2001) (relying on
Gunter, Cendant, and Rite Aid in awarding 34% of settlement
fund); In re Monosodium Glutamate Antitrust Litig., 2003 WL
297276 (D. Minn. Feb. 6, 2003) (awarding 30% of settlement fund).

Here, the requested percentage of 26% is not excessive
judged by these norms.

### 8.   Additional *Prudential* factors

Beyond the Gunter factors analyzed above, the additional
considerations identified in Prudential, 148 F.3d at 338-340, are
addressed now.

First, the benefits accruing to the class members were
largely attributable to Class Counsel, but were also a product,
to some extent, of the successful prosecutions launched by the
U.S. Department of Justice Antitrust Division, which obtained
several convictions of persons implicated in this electrical
carbon products price-fixing.  In Prudential, for example, it was
necessary to distinguish between benefits created by class
counsel and those created by a multi-state life insurance task
force which was formed to investigate allegations against the
defendant.  Prudential, 148 F.3d at 338.  In AT&T Corp. Sec.
Litig., on the other hand, class counsel was not aided by the
efforts of any governmental group.  455 F.3d at 173.  In the
present case, Class Counsel had the benefit only of the

indictments or criminal informations and the guilty pleas for sketching out the possibility of a civil antitrust case, but counsel were largely on their own to develop a theory of the case, explore its full contours, obtain discovery, and develop plausible theories of liability and of damages that could be monetizable into a settlement.  Learning the existence of a criminal prosecution was only the beginning, and it was the efforts of Class Counsel, much more than the Antitrust Division, that built the recovery for the class here.

Second, consideration of "the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained," Prudential, 148 F.3d at 340, is inconclusive.  The 26% fee requested here seems to be well within the range of a reasonable fee to which attorney and client would customarily agree.  To the extent that risks of non-recovery were substantial and the defense efforts would likely be formidable, a higher contingent fee would be necessary to entice experienced private antitrust counsel to accept the case.  The present request of 26% appears well within the typical negotiated fee, or on the low side for high risk complex litigation with a long delay before any recovery is expected.

Third, whether class counsel have promoted any "innovative" terms of settlement must be considered.  Prudential, 148 F.3d at 339.  Class Counsel here are responsible for the rekindling of

44

settlement negotiations after the Crowell & Moring Plaintiffs'
opt-outs, requiring considerable creativity and stamina.  By
reducing their requested fees with respect to the Morgan, Schunk,
and SGL settlements from 33 1/3% to 25%, Class Counsel made the
proposed settlements more enticing to the Crowell & Moring
Plaintiffs, who subsequently joined these three settlements while
remaining outside the Carbone settlement.  These adjustments
helped create value for the settlement class.

9.   **Lodestar cross-check**

Finally, the request for an attorneys' fee award of 26% of
the common fund will be held up to scrutiny through the lodestar
cross-check, as required by the Third Circuit in AT&T Corp. Sec.
Litig., Rite Aid, and Prudential, inter alia, above.

The Court has examined the time summaries of all plaintiffs'
counsel, including appointed lead counsel, liaison counsel, and
individual counsel who had been retained by parties before the
cases were consolidated.  These records are contained in the two
volumes of "Declarations of Plaintiffs' Counsel in Support of
Motion for Award of Attorneys' Fees, Reimbursement of Expenses
and Incentive Payments to the Class Representatives" dated
September 29, 2005, including individual declarations at Exs. 1-
38 thereto, and updated Supplemental Declarations of Steve A.
Asher, Sandra A. Jeskie, Lisa J. Rodriguez, Warren Rubin, and
Howard J. Sedran submitted April 10, 2006 as Exs. A-E

respectively, of "Supp. Mem. in Support of Motion for Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Payments to the Class Representatives," and the Letter of Howard J. Sedran on behalf of the Class Executive Committee dated May 15, 2006, which attached a detailed summary chart of the cumulative lodestar and expenses, as well as the supplemental lodestar and expenses for each firm rendering services in this case.

The total lodestar amount is $5,860,512.75 and the total litigation expenses are $493,078.17, as shown on the summary chart and supplementation.  These accurately reflect the earlier Declarations in Exs. 1-38, above, and the Supplemental Declarations in Exs. A-E, above.  The total hours through September 9, 2005 for attorney and paralegal time were 16,767.33 hours, and the supplemental hours through March 31, 2006 totaled 532.3 hours.  The claimed lodestar hours through March 31, 2006 were thus 17,299.63 hours.[17]  Additional time was expended after

_____

[17] As noted, the Court reviewed the certified time summaries on an attorney-by-attorney basis for each participating firm. These summaries give the attorney or paralegal's hourly billing rate and the total number of hours for services rendered in this case, normally expressed in tenths of an hour, based on contemporaneous recordkeeping of the actual tasks performed or services rendered.  The more detailed underlying records were available but this Court saw no need to review them for the purposes of this lodestar cross-check.  The Third Circuit has noted that, for cross-check purposes in a common fund case, time summaries are sufficient, Prudential, 148 F.3d at 332 n.107, and that "waiting to submit such detailed records until they are requested by the Court seems consonant with the practice in this circuit."  Gunter, 223 F.3d at 200.

March 31, 2006 and will be expended in the future, so that the figure of 17,299.63 hours is the conservative estimate of total time spent.

The average hourly rate is about $339 for each firm. Counsel have certified to the reasonableness of their rates as customarily charged and approved by other courts.  The hourly rates are based on the 2003 historical hourly rates charged, without adjustment to the current rates typically required for the lodestar calculation.  Thus, the total lodestar figure of $5,860,512.75 understates the actual cumulative lodestar that could have been requested if current hourly rates were used.

Since a full-blown lodestar analysis is not required for cross-check purposes, a summary of the documentation of hours actually expended is useful without probing more deeply into each hour claimed or each task performed.  That is especially true in the present case, where the attorneys' fees requested are slightly <u>less</u> than the lodestar claimed, and that lodestar is based upon historical 2003 rates rather than higher 2006 rates.[18]

---

[18] If a more detailed lodestar examination were performed, the result is not likely to change in any significant way.  For example, if 25 percent of the hours claimed were to be eliminated for reasons such as duplication or excessiveness to the task completed, the lodestar would shrink, but that shrinkage would be offset by using 2006 billing rates instead of the 2003 rates. Further, even if the multiple grew to 1.25, for example, such a result, in a lengthy case with uncertain recovery, does not imply any need to adjust the common fund percentage fee.  <u>See</u> <u>e.g.</u>, <u>AT&T Corp. Sec. Litig.</u>, 455 F.3d at 173 ("a multiplier of 1.28 is well within a reasonable range" where significant time and effort

Here, the fees claimed based upon 26% of the recovery are $5,700,003.10, while the lodestar is $5,860,512.75.  The lodestar multiplier is approximately 0.97.  There is no disparity here between the fees requested and the lodestar cross-check figure.  By this important measure, the requested fees are extremely reasonable and congruent with the work performed.  A multiplier of 0.97 is modest in comparison with the multiples from 1 to 4 frequently awarded in common fund cases, see Prudential, 148 F.3d at 341, depending on circumstances presented.

Accordingly, the lodestar cross-check provides significant confirmation in this case of the reasonableness of the fees sought under the percentage-of-recovery method.

### 10.  Conclusions regarding percentage-of-recovery fee request

This Court has the firm impression, after supervising this multidistrict litigation and considering the relevant factors under Gunter, Prudential, and related authority, that in the circumstances of this case the requested attorneys' fee award of 26% of the common fund is fair, reasonable, and adequate compensation for the attorneys' efforts in creating value for the settlement class members.

---

were devoted by class counsel.)

Picking up on the allegations of illegality charged by the Justice Department regarding some segments of the electrical carbon products market in the United States, Class Counsel were instrumental in creating a $21.9 million settlement fund, consisting of four sub-settlements, each of which has been determined to be reasonable, adequate, and fair.  When the class received notice that the fee application would be as high as 33 1/3 percent of the fund, inclusive of costs, no member of this class of industrial purchasers objected.  Such a request would have amounted to one-third of $21.9 million, which is $7.3 million.  The present fee request was voluntarily reduced by counsel to approximately 26% of the fund ($5,700,003.10) plus reimbursement of costs and expenses of $493,078.30, for a comparable total of $6,193,081.40, or more than $1.1 million less than the maximum amount that had itself drawn no objection.

Counsel were skillful and efficient and exhibited the highest order of professionalism in obtaining settlements which overcome the uncertainties of recovery.  The time devoted to the case at customary rates similarly justifies this award, and the requested percentage fee is in line with awards in comparable cases.

While it is recognized that counsel's efforts in generating this recovery were boosted initially by the criminal investigation and convictions, the formidable task of developing

and pursuing a civil antitrust litigation strategy fell completely to plaintiffs' counsel.  It cannot be said that counsel have merely exploited the work of public authorities to earn this fee; they have instead added great value for the class.

As discussed above, the present request of 26% appears well within the typical negotiated fee for high risk, complex litigation with a long delay and highly uncertain outcome. Finally, counsel promoted innovative and productive settlement strategies that created value for the settlement class.

For all these reasons, pursuant to Rule 23(h)(3), Fed. R. Civ. P., this Court approves the attorneys' fee request in the amount of $5,700,003.10 to be paid out of the common settlement fund.

## B.    **Award of Costs and Expenses**

In accordance with the settlement agreements, counsel seek reimbursement of out-of-pocket expenses incurred in bringing this case to a successful conclusion in the total amount of $493,078.17.  Common litigation costs were paid out of a litigation fund, and counsel paid assessments into that fund in anticipation of litigation costs.

The Court has reviewed the detailed inventory of all such costs expended and finds these expenditures to have been reasonable and necessary.  Among the principal expenses were economic expert expenses, outside copy expenses, and service of

50

process, with translations, on foreign defendants.  (See

Declaration of Howard J. Sedran (Sept. 28, 2005)).  Also, each of

the Declarations in Exs. 1-38 and the Supplemental Declarations

in Exs. A-E itemizes the costs expended, broken down into 13

categories:

>     Assignment Payment to Plaintiffs' Common Fund
>     Commercial Copies
>     Internal Reproduction/Copies
>     Court Fees (filing, etc.)
>     Court Reporters/Transcripts
>     Computer Research
>     Telephone/Fax/Email
>     Postage/Express Delivery/Messenger
>     Professional Fees (expert, investigator, accountant, etc.)
>     Witness/Service Fees
>     Travel:  Air Transportation, Ground Travel, Meals, Lodging,
>              etc.
>     Clerical Overtime
>     Miscellaneous/Other (describe)

The Court reviewed all claimed costs and finds no

questionable entries.

The expenses allocable to the Carbone settlement are

accounted for specially here, because the award sought in the

Carbone settlement was 33 1/3% inclusive of expenses, while the

awards sought in the other three settlements was 25% exclusive of

expenses.  Since the Carbone settlement is 16.9% of the common

fund, the Court allocates 16.9% of the expenses to the Carbone

matter, in the sum of $83,330.10.  These expenses were subtracted

from the Carbone figure for 33 1/3 percentage-of-recovery of the

Carbone settlement of $3.7 million, yielding a total of

attorneys' fees plus expenses of $1,233,333.00.  When the Carbone

share of expenses ($83,330.10) is subtracted, the counsel fee share for Carbone becomes $1,150,003.10, which was the figure sought and awarded above as part of the overall attorneys' fee award for the four settlements of $5,700.003.10.  Therefore, the Carbone-associated expenses do not have to be subtracted a second time when computing overall expenses.  Pursuant to Rule 23(h)(3), Fed. R. Civ. P., the Court will award expenses of $83,330.10 associated with Carbone, plus expenses of $409,748.07 associated with Morgan, Schunk and SGL, for a total reimbursement to counsel of $493,078.17 to be paid out of the common fund.

C.    **Incentive Awards for Class Representatives**

The approval of incentive awards to class representatives was originally sought upon notice to the class, which amounts were reduced in the supplemental class notice.  The application seeks to pay, from the common fund, incentive awards of $12,000 each for plaintiffs SEPTA, New York City Transit Authority, the Long Island Railroad, Metro North Commuter Railroad Company and Lockwood Electric Motor Service of Trenton, in addition to $6,000 each for BART and the City and County of San Francisco.  No objections to payment of these special incentives were received. The purpose of these awards is to compensate the time and efforts in responding to interrogatories and document production requests and appearing through a corporate designee at depositions, except for BART and San Francisco who did not have to furnish designees

52

for depositions.  These efforts conferred benefit on all class members, while causing these class representatives to expend time, effort, and money not required of any other class members.

In a case such as this one where extensive discovery efforts were required of the class representatives, such incentive awards commensurate with their time and effort are appropriate where a benefit was conferred by those efforts upon the class as a whole. Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998); Auto Paint Antitrust Litig., supra, 2003 WL 23316645, at *22; Linerboard, 2004 WL 1221350, at *18-19; In re Plastic Tableware Antitrust Litig., 1995 WL 723175, *2 (E.D. Pa. Dec. 4. 1995).

The incentive awards in the total amount of $72,000 are approved for payment from the common fund.


### V.   CONCLUSION

For the foregoing reasons, the proposed settlement class is certified, and the four proposed settlements are approved, generating a total common fund of $21,900,000.  From this fund, the Court authorizes payment of attorneys' fees of $5,700,003.10, plus reimbursement of expenses of $493,078.17, plus payment of incentive awards to class representatives totaling $72,000.

The two accompanying Orders are entered; the first certifies the class and approves the settlements, and the second awards

attorneys' fees, expenses, and incentive awards from the

settlement fund.


**August 30, 2006**                    **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                       United States District Judge