IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In Re:  ELECTRICAL CARBON<br>PRODUCTS ANTITRUST LITIGATION | MDL No. 1514<br><br>Master Civil No. 03-2182 (JBS)<br><br>**OPINION** |

**APPEARANCES:**

### **Plaintiffs' Class Counsel**:

Mindee Reuben, Esquire
Weinstein Kitchenoff & Asher, LLC
1845 Market Street, Suite 1100
Philadelphia, PA  19103

Sandra A. Jeskie, Esquire
Charlene Fullner, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA  19103

Howard J. Sedran, Esquire
Austin Cohen, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street
Philadelphia, PA  19106

Warren Rubin, Esquire
Law Office of Bernard Gross, PC
450 John Wanamaker Building
Juniper & Market Streets
Philadelphia, PA  19107

### **Co-Liaison Counsel for Class Plaintiffs**:

Lisa J. Rodriguez, Esquire
Trujillo Rodriguez & Richards, LLC
8 Kings Highway West
Haddonfield, NJ  08033

Allyn Z. Lite, Esquire
Lite DePalma Greenberg & Rivas,
LLC
Two Gateway Center, 12th Floor
Newark, NJ  07102

### **Counsel for Plaintiffs Emerson Electric Co., et al.**:

Jerome A. Murphy, Esquire
Daniel A. Sasse, Esquire
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595

**Counsel for Plaintiff Chicago Transit Authority**:
Anne B. Sekel, Esquire
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016
    -and-
Martin J. Bishop, Esquire
Foley & Lardner LLP
321 N. Clark Street
Suite 2800
Chicago, IL 60610

**Counsel for the CAR Claimants**:
David Stone, Esquire
Ian Dumain, Esquire
Robert A. Magnanini, Esquire
Boies, Schiller & Flexner, LLP
150 John F. Kennedy Parkway
4th Floor
Short Hills, NJ 07078
    -and-
Nathan Edelstein, Esquire
Nathan M. Edelstein, PC
123 Franklin Corner Road
Lawrenceville, NJ 08648

**Counsel for Claimant Flowserve**:
Arleigh P. Helfer, Esquire
Hoyle Fickler Herschel & Mathes
One South Broad Street
Suite 1500
Philadelphia, PA 19107
    -and-
Mark Briol, Esquire
Briol & Associates, PLLC
3700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

**Counsel for Claimants EIS and Electrical Carbon Products:**
Edward S. Kiel, Esquire
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, PC
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602

**SIMANDLE, District Judge:**

I.    **INTRODUCTION**

This matter is before the Court in this Multidistrict Litigation on the motion of Class Counsel for approval of a plan of distribution of the settlement fund [Docket Item 271].  After reviewing claims received under the previously-approved class action settlement in this case, the Settlement Administrator proposed a plan of distribution that would recognize "allowed

2

purchases" of electrical carbon products in the aggregate amount of over $378 million,[1] as the basis for the pro rata distribution from the four settlement funds paid in by the various defendants totaling $21.9 million less attorneys' fees and expenses.[2]  The proposed plan of distribution excludes those claimants whose claims were submitted after February 16, 2006, or whose purchases allegedly did not consist of electrical carbon products within the class definition.  Prior to the hearing on the motion, the following claimants filed opposition to their exclusions from the proposed plan of distribution:

> The Chicago Transit Authority ("CTA") [Docket Items 273, 304];
>
> The Class Action Refund Claimants ("original CAR claimants"), which is a group of fifteen individual claimants whom Class Action Refund represented during the claim process, namely, Mahaffey's Electric Motor Repair, Kidd Machine & Manufacturing Company, Warfield Electric Company, Flex-Tech Integrated Supplier, Phelps Dodge High Performance

---

[1] Following review and audit of claim forms, the Settlement Administrator and Class Counsel have recommended approval of claimants for inclusion in the distribution from the common fund settlements based upon the amount of allowed purchases aggregating $378,002,266.56.  (Hamer & White Aff., Feb. 7, 2007, at ¶ 21.)

[2] The four groups of defendants have contributed to a settlement fund of $21.9 million, less approved attorneys' fees and expenses, consisting of contributions of $15 million from the Morgan Defendants, $3.7 million from the Carbone Defendants, $2.975 million from the Schunk Defendants and $225,000 from Defendant SGL.

> Conductor, Border Industrial Motors[3], Aetna
> Manufacturing Company, Becker Bros., Aero
> Accessories, Inc., Milwaukee Electric Tool
> Corporation, Prestolite Electric, Inc.,
> Zeller Electric Company, Inc., KBZ Electric,
> Inc., Crown Industrial Supply Division of
> Steiner Electric Company, and Beltline
> Electric Motor Repair, Inc. [Docket Items
> 276, 307];[4]
>
> Electric Insulation Supply, Inc. ("EIS")
> [Docket Item 286];
>
> Arkansas General Industries ("AGI")[Docket
> Item 287]; and
>
> Flowserve Corporation ("Flowserve") [Docket
> Item 283].

The Crowell & Moring Plaintiffs filed a brief in support of Class

Counsel's plan of distribution [Docket Item 293].[5]  (The "Crowell

& Moring Plaintiffs" are Emerson Electric Co.; Valeo S.A.; Valeo

Inc.; CBS Corporation; Electrolux Home Care Products, Ltd.;

Delphi Corporation; Robert Bosch GmbH; Robert Bosch Corporation;

A.O. Smith Corporation; Visteon Corporation; Rockwell Automation,

---

[3]  However, Border Industrial Motors, Inc. later conceded
that it did not purchase qualifying electrical carbon products
and withdrew its objection to excluding its claim.  (Del Gatto
Aff., July 3, 2007 [Docket Item 329], at ¶ 10.)

[4]  As explained below, CAR also represented other claimants
who objected to the proposed plan of distribution at a later
date.  To distinguish between the claimants, the Court shall
refer to this original group of CAR objectors simply as "the
original CAR claimants."

[5]  The Crowell & Moring Plaintiffs take no position with
regard to the validity of the claims of the Chicago Transit
Authority and Arkansas General Industries, Inc.

Inc.; Baldor Electric Company; Fasco Industries, Inc.; and Siemens Transportation Systems, Inc.)

The Court held hearings on the motion on May 23, June 20 and August 2, 2007, during which several of the parties clarified their positions.  Additional facts came to light, additional objections were raised, and some disputes were resolved. Notably, in June 2007 an additional twenty-five claimants represented by CAR ("the new CAR 25") raised objections to their exclusion from the proposed plan of distribution for the first time [See Docket Item 330].[6]

---

[6]  Those claimants are Hudson-Sharp Machine Co.; Consultex Systems Inc.; Machinery Components Inc.; Hydro-Egroseal Inc.; Southern Electric Motor Inc.; Iowa Interstate Railroad; Koontz Wagner Electric Co.; Conbraco; Master Motor Rebuilders Inc.; Ventura County Railroad; Toledo, Peoria & Western Railroad Corp.; Arizona & California Railroad; Kyle Railroad; Indiana & Ohio Railway Co.; Phoenix Sales & Services; ABC Bus Companies, Inc.; JMC Products Inc.; United Knitting Machine Co. Inc.; KBM Industrial Inc.; Ward Leonard Electric Co.; Alstom Transportation Inc; Miraj Specialties Corp.; Modern Motor Industries; World Wide Equipment; and JCH Enterprises.  All claimants represented by CAR, that is the original CAR claimants and the new CAR twenty-five, shall be referred to collectively as the "CAR claimants"

Apparently the Claims Administrator had previously informed those claimants that their claims would be recommended for approval, so that the proposed plan was the first indication to the contrary.  Counsel for CAR conceded that it overlooked the claims for those individuals when it initially reviewed the proposed plan of distribution because of those earlier assurances from the Claims Administrator.  Although disputes remain as to the timeliness of the claims and objections of all of the new CAR 25 claimants, if the Court were to find that timeliness issues did not bar the claims of Aero Accessories, KBZ Electric and Miraj, the parties have agreed on the amounts of qualifying purchases made by these claimants.  Only the timeliness of these claims remains in dispute.

The Court reserved decision on the motion and now grants it in part and denies it in part as explained herein.

The original deadline for filing claims was October 24, 2005, and claims continued to trickle in after that date.[7] Class Counsel proposed treating claims as timely if they were completed on or before February 16, 2006. The dispute about the proposed distribution raises two principal issues: (1) whether claims documented after February 16, 2006 – the date the Crowell & Moring Plaintiffs decided to opt back into the class subject to Court approval – are inexcusably late and (2) whether certain claimants failed to make qualifying purchases at all, thus excluding them from the class definition and denying them any basis for their claims.

Rather than setting a cut-off deadline for the claims at issue, the Court looks at each claimant's conduct and determines whether its delay in filing a claim is the result of "excusable neglect" as that term has been defined in this Circuit. See In re Orthopedic Bone Screw Prods., 246 F.3d 315, 323 (3d Cir. 2001). Using this analysis, for reasons discussed below, the

_____

[7] According to the Settlement Administrator, 125 claims were timely filed as of October 24, 2005, and 37 claims were filed after October 24, 2005 but on or before February 16, 2006, and 68 claims were filed on or after February 17, 2006, for which rejection is recommended as untimely. (Hamer & White Aff., Feb. 7, 2007, at ¶¶ 16-18, Exs. G, H, I.) Additional claimants surfaced later, as discussed below.

Court finds that the CAR claimants and EIS have failed to show their delay is the result of excusable neglect.  Therefore, the Court shall grant the motion insofar as it seeks to exclude these late claimants.

As to issue of whether certain claimants made qualifying purchases, the Court will not reach it because it is now moot. Because Class Counsel seeks to exclude only certain CAR claimants for failure to make qualifying purchases, and because the CAR claimants cannot share in the fund under the Court's first ruling due to inexcusable delay, the Court need not parse the class definition on this motion to determine whether certain purchases are within the class definition of electrical carbon products. Although it is not self-evident whether these claimants are members of the class, their failure to show excusable neglect is dispositive of their rights to share in the funds; the Court, therefore, having determined that Class Counsel are correct in excluding the CAR claimants due to inexcusable neglect, shall not reach beyond this motion to decide the merits of disputes when such a decision can have no practical effect.

## II.  BACKGROUND

In this Multidistrict class action, the Court certified a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and approved a settlement, pursuant to Fed. R. Civ. P. 23(e), on August 30, 2006.  In re Electrical Carbon Prods. Antitrust Litig., 447 F.

Supp. 2d 389 (D.N.J. 2006).  The Court defined the class as:

> All persons and entities (excluding Federal
> government entities, Defendants and their
> respective parents, subsidiaries, and
> affiliates) who purchased Electrical Carbon
> Products in the United States, or from a
> facility located in the United States,
> directly from Defendants, their affiliates,
> subsidiaries, or alleged co-conspirators,
> during the period January 1, 1990 through
> December 31, 1999 (the "Class Period").

Id. at 389.

The Court had given preliminary approval of the settlement classes and the proposed settlements on May 11, 2005.  In re: Elec. Carbon Prods. Antitrust Litig., No. 03-2182 (JBS), (D.N.J. May 11, 2005) [Docket Item 179].  The Court ordered that notice (1) be mailed via first class mail on or about June 27, 2005 to the last-known addresses of all members of the class as identified by Defendants; (2) be published in the Wall Street Journal on or about July 7, 2005; and (3) be posted on the Claims Administrator's website.  Id. at ¶¶ 7-10.  The Court also ordered that all requests for exclusion be mailed by August 22, 2005 and that all proof of claim forms be postmarked by October 24, 2005 and comply with the requirements for filing a proof of claim set forth in the notice.  Id. at ¶¶ 11, 13-14.  That notice included a provision which stated, "The Settlement Fund . . . will be distributed among the members of the Class who file timely and valid Claim Forms ("Claimants").  Ex. 1 to id., at 5.

The Net Settlement Fund will be distributed *pro rata* to all claimants based on their direct purchases" from Defendants in the United States during the relevant time period.  Id.  Another provision emphasized, "Any Class Member who does not complete and timely return the Claim Form will not be entitled to share in the Net Settlement Fund."  Id. at 6.  The proof of claim form, with its instructions, was attached to the notice.  Ex. 3 to id.  The proposed settlement fund for the original settlement was $24.2 million.  Ex. 1 to id. at 3.  Pursuant to the Court's Order, the Claims Administrator mailed notice to 4,887 class members on June 27, 2005. (Hamer Aff. Sept. 29, 2005, ¶ 4.)

Shortly before the date for requesting final exclusion from the class in 2005, thirteen entities gave timely notice of their wish to opt-out, including twelve large companies represented by the law firm of Crowell & Moring (the "Crowell & Moring" Plaintiffs).  In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d at 393.  The Crowell & Moring Plaintiffs had made a sizable share of purchases at issue in this case, totaling several hundred million dollars.  Id.  Their opting-out triggered the walk-away rights under the Morgan, Schunk and Carbone settlement agreements.  Id.  (The SGL agreement has no walk-away provision.)  Thereafter, the Morgan, Schunk and Carbone settling Defendants announced their intention to withdraw from the proposed settlements because of the volume of purchases

9

represented by the Crowell & Moring Plaintiffs.[8]  Id. at n.4.  If
that had happened, the litigation would have gone forward with no
settlements.  Id.  Other than the Crowell & Moring Plaintiffs,
only one entity opted out, leaving approximately 451 class member
claimants.  Id. at 393.[9]

Class Counsel, joined by counsel for Morgan, Carbone, and
Schunk, entered into discussions with the Crowell & Moring
Plaintiffs to determine whether the latter would be willing to
rejoin the Class and participate in the settlements.  Id. at 394.
Under Court supervision, these discussions led to agreements
whereby the Crowell & Moring Plaintiffs requested to rejoin the
Morgan, Schunk, and SGL settlements, id., on February 17, 2006,
after viewing the number and amount of claims submitted to that
date, (Hamer Aff., Feb. 7, 2007).[10]  On February 21, 2006, the

_____

[8]  The Court had continually enlarged the time within which
the defendants could exercise their walk-away rights.  See, e.g.,
Feb. 9, 2006 Order [Docket Item 223] (enlarging time for walk-
away until February 21, 2006).

[9] The original notice was mailed by the Claims Administrator
on June 27, 2005 to 4,887 entities.  (Hamer Aff., Sept. 29,
2005.)  Through September 27, 2005, these mailings yielded the 13
requests for exclusion (including the 12 Crowell & Moring
Plaintiffs and one from Precision Machining).  Id.

[10] In February 2006, the Claims Administrator provided the
parties with an estimate of the allocation of settlement funds
for the Crowell & Moring plaintiffs assuming that all claims
submitted as of that date were valid.  In estimating that
allocation, the Claims Administrator did not utilize the
purchases of class members who filed only blank claim forms as of
February 2006.  (Hamer Aff., Feb. 7, 2007 at ¶ 15.)

Court entered an Order approving the Crowell & Moring Plaintiffs'
withdrawal of their request for an exclusion [Docket Item 221].

Because Class Counsel agreed to reduce their request for
attorneys' fees from 33 1/3% including costs and expenses, to 25%
of the settlement funds, not including costs and expenses, the
same fund increased the net value to the class of the Morgan,
Schunk, and SGL settlements.  447 F. Supp. 2d at 394.

The initial Carbone settlement was renegotiated and amended
by reducing the negotiated settlement amount from $6 million to
$3.7 million.  Id.  In exchange for that reduction, the Carbone
Defendants agreed not to exercise their option to terminate their
settlement with the class, even though the Crowell & Moring
Plaintiffs did not rejoin that settlement.[11]  Id.  Requested
attorneys' fees from the Carbone settlement fund remained capped
at 33 1/3%, including costs and expenses.  Id.

Because these developments changed the original settlements,
the Court Ordered a Supplemental Notice to all entities that had
responded to the prior notice (the 451 class member claimants and
the one opt-out that was not a Crowell & Moring Plaintiff) on
March 27, 2006.  Id.  The Court gave preliminary approval of the
amended settlements and of the Crowell & Moring Plaintiffs'

---

[11] Thus, only the Crowell & Moring Plaintiffs' claims
against the Carbone Defendants went forward in litigation,
captioned Emerson Electric Co. v. The Morgan Crucible Company,
PLC, Civil Action No. 05-6042 (JBS) (D.N.J.).

11

application to withdraw their opt-out notices and rejoin the
class for the Morgan, Schunk, and SGL settlements.[12]  See id.
Anybody wishing to object to this preliminary determination was
informed of the right to do so by submitting an objection by May
1, 2006.  See id.  Copies of relevant documents were also
available on the website for this case,
www.ElectricalCarbonProductsLitigation.com.  No objection to the
amended settlements was received, and none was voiced at the
final hearing on May 12, 2006.  Id. at 394.  In response to the
supplemental notice, no other party opted-out or objected to the
settlements and the requested attorneys' fees and costs.[13]  Id.
at 394-95.

     The Court determined that permitting the Crowell & Moring
Plaintiffs to rejoin the Morgan, Schunk, and SGL settlements
enabled those settlements to go forward and that this was in the

---

     [12] The Supplemental Notice informed the class members and
the opt-out entities of the initial decision of the Crowell &
Moring Plaintiffs to opt out of the settlements, the various
agreements that were reached among the parties allowing the
Crowell & Moring Plaintiffs to rejoin the Morgan, Schunk, and SGL
class and participate in those settlements, the amended Carbone
agreement, the reduction of the fee request of Class Counsel in
the Morgan, Schunk, and SGL settlements, the right to object to
the settlements, and the hearing for final approval, which was
set for May 12, 2006.

     [13] One entity, ThyssenKrupp Elevator, objected to its
exclusion from the class definition by the claims administrator.
The Court heard the objection de novo and denied it, finding this
entity was not a purchaser of products fitting the definition of
"Electrical Carbon Products," in an Order filed May 17, 2006.

best interests of the Settlement Class -- that there be a fair and reasonable settlement including these parties rather than no settlement at all. Id. at 397.  The Court also determined that the opt-in of the Crowell & Moring Plaintiffs was fair to all the Class Claimants who had not opted out but submitted their claims from the beginning because no class member relied to its detriment on the Crowell & Moring Plaintiffs' original decision to opt out as that development was contemporaneous with all other decisions and could not have been a factor in the decision of any particular class member to participate.  Id.  Second, because two of the three Settling Defendants -- Morgan and Schunk --- indicated they would exercise their withdrawal options in the absence of the participation by the Crowell & Moring Plaintiffs, the Court noted there would have been no settlements without them.  Id.  Third, the Court found there was no special advantage conferred upon the Crowell & Moring Plaintiffs through opting out and then opting back in.  Id.  Finally, the Court found that these settlements were adequate, reasonable, and fair to the class members, as required by Rule 23(e), Fed. R. Civ. P.  Id. at 397-404.

The Court also found the Carbone settlement, which the Crowell & Moring Plaintiffs did not rejoin, to be fair and reasonable because it increased the anticipated payment to each remaining claimant.  Id. at 397-98, 404.

13

In determining whether the class counsel's fee was
appropriate, the Court had to consider the size of the fund
created and the number benefitting from it.  The Court relied on
the number of claimants at that time in determining whether those
fees were reasonable:

> The total fund created from these four
> settlements is $ 21,900,000, representing
> over 3% of class members' purchases in the
> United States during the class period.
> Approximately 5,000 class members were mailed
> copies of the Class Notice. There are
> approximately 451 Class claimants, plus the
> 12 Crowell & Moring Plaintiffs which have
> been allowed to opt-in to the final Morgan,
> Schunk and SGL settlements, as discussed in
> Parts II and III.B, above. Class Counsel were
> instrumental in negotiating, and
> renegotiating, settlements creating a
> substantial fund for the class of plaintiffs
> which had the wide majority of sales.

Id. at 406.

Thus, the Court's fairness determination depended both on a
reasonable projected range of money class members would receive
and on a finding that no class member was being treated to an
advantage the others did not also enjoy.

On February 7, 2007, Class Counsel filed this motion for
approval of its proposed plan of distribution.  Timely opposition
followed from the CTA, the original CAR claimants, EIS, AGI, and
Flowserve.  This Court held hearings and heard argument on May
23, June 20 and August 2, 2007. [Docket Items 309, 327, 337.]  At
those hearings, new facts were developed and new objections were

14

raised, especially regarding the adequacy of documentation, the timeliness of objections and whether certain claimants made qualified purchases from Defendants.  The Court reserved decision and now addresses the motion for approval of the plan of distribution filed by Class Counsel.

### III. THE DISPUTED CLAIMS

#### A.    Claims Filed After February 16, 2006

As noted, the Court required all claim forms to be completed and postmarked by October 24, 2005.  Class Counsel essentially suggests a grace period until February 16, 2006, in light of the then-ongoing negotiation of the amended settlements.  Primarily, Class Counsel seeks to preclude all claims that were filed after the date on which the Crowell & Moring Plaintiffs assessed the value of the settlement to them and decided to rejoin the class. Because this Court is required to determine whether there was excusable neglect for the delay of each claim, the Court will not set a generic cut-off date.  Rather, the Court shall analyze each proposed late claim and determine whether the delay in filing it is excusable.

An overview of the claims process will aid understanding the factual background of this motion.  Class members submitting proofs of claim were required to fill out a schedule setting forth the dollar amount of their claimed purchases for each class year listed and indicate from which defendant they purchased.

For any year within the class period without a claimed purchase, the claimant was supposed to enter a zero.  However, several claimants initially filed blank claim forms, with no information about purchases, and later submitted forms that did contain some information.

One hundred sixty-two claims were submitted before February 17, 2006. (Exs. G, H to Hamer & White Aff., Feb. 7, 2007.) Sixty-eight claims were filed on or after February 17, 2006, excluding the claims of the Crowell & Moring Plaintiffs. (Ex. J to id.)  Class Counsel and the Administrator recommended that the Court reject all sixty-eight of these claims as untimely and bar those claimants from sharing in the settlement.  All of the class members objecting to the plan of distribution fall into this category.[14]

Included in this group are those who filed blank claims before February 16, 2006 but did not detail or document their claims until after that date.  The Claims Administrator did not deem those claims filed until the amount of qualified purchases was reported.  Nor does the Court; the claims process required certification that the claimant made qualified purchases from the

_____

[14]  Class Counsel recommends that of the late filers, several could also be excluded for failure to substantiate that they made qualified purchases.  These claimants are: Flex-Tech, Phelps Dodge, Becker Bros., Zeller Electric, Crown Industrial, and Beltline.  As noted above, on this motion the Court need not address whether these parties made qualified purchases.

defendants for the years covered by the settlement.  Thus, a blank form does not constitute a complete claim.  However, the Court, in performing the excusable neglect analysis below, shall consider the fact that some claimants filed blank forms.

**B.   Whether Delay is Excusable**

The parties all agree that to determine whether qualified late claimants may share in the settlement fund, the Court must make an equitable determination whether there was "excusable neglect" for each claimant.[15]  This requires looking at (1) the danger of prejudice to the other class members or to the defendants, (2) the length of the delay and its effect on judicial proceedings, (3) the reason for the delay, including whether it was withing the reasonable control of the late claimant, and (4) whether the late claimant acted in good faith.  See In re Orthopedic Bone Screw Prods., 246 F.3d 315, 323 (3d Cir. 2001).

As a primary matter, the Court must decide whether lateness

---

[15]   Contrary to its written submissions, the Crowell & Moring Plaintiffs briefly argued orally that the Court must reject the late claimants' participation in the distribution of funds absent extraordinary circumstances.  "[T]he Court ought to send that message that there are consequences . . . , there are deadlines and they need to be complied with absent extraordinary circumstances."  (Tr. 28:11-8.)  That simply is not the law in this Circuit; the standard is excusable neglect, under Orthopedic Bone Screw.
    Further, there is no evidence of bad faith, which, in other circumstances, might necessitate sanctioning a party for ignoring deadlines.

should be defined by the Court-ordered filing deadline of October
24, 2005 or by the date on which the Crowell & Moring Plaintiffs
analyzed the share of the fund available to them, February 16,
2006.  For purposes of this equitable analysis, the Court shall
look at both issues.  Although Class Counsel has sought to
restrict all claimants who filed after February 16, the proper
inquiry focuses on whether the claims were late and why, not on
setting a cut-off deadline.  All of the claims at issue here were
filed beyond the court-ordered deadline.  On the other hand,
while the Court never changed its ordered deadline for filing
claims, there was no viable settlement in this case until the
Crowell & Moring Plaintiffs opted back in to three of the
settlements in February 2006, while the fourth settlement (with
the Carbone Defendants) was renegotiated without them.  Further,
the Court did not approve the settlement of this class action
until August 2006.  Thus, the Court shall consider when each
claim was filed, why it was filed when it was, both with respect
to the failure to meet the initial deadline or the suggested
"grace period" date within four months of that deadline, and what
effect the late filing has on this action, in accordance with the
Orthopedic Bone Screw analysis.  The Court shall eschew rigid
adherence to a deadline, either the October 24, 2005 deadline or
the proposed deadline of February 16, 2006, in favor of a
balancing of equitable factors.  See Orthopedic Bone Screw, 246

18

F.3d at 316-17 ("We recognize that deadlines are an integral
component of effective consolidation and management of the modern
mass tort class action.  Yet rigid and unquestioned adherence to
such limitations belies principles of equity and the court's role
as a fiduciary in class actions when allowing a claimant
participation in a settlement works no harm on the conduct of the
proceedings and does not significantly prejudice the interests of
the parties." (citation omitted)).

      1.   Prejudice to the Class

Because the settlement fund is fixed, there will be no
prejudice to Defendants from permitting additional claimants to
benefit, pro rata, from the settlement, as all parties concede.
Indeed, Defendants have no stake in this motion and have filed no
response to it.

Rather, the issue is whether other (earlier) claimants will
be prejudiced by the inclusion of the late claimants, whose
claims will necessarily reduce the share of the settlement
revenues available to timely filers.  See id. at 323-24 (court
should look at effect on timely claimants, not on defendants,
when late claimant seeks to share in fixed-fund settlement).
Prejudice to other claimants was the focus of the oral arguments
in this case and all parties had ample opportunity to address the
issue.

In addition, all parties concede that courts have generally

said the mere reduction of money available to timely registrants
is not considered prejudice for purposes of this inquiry.  See,
e.g., id. at 324.  All legitimate members of the class are
normally presumed equally entitled to share in recovery.

> It cannot be maintained that timely
> registrants are more deserving of remedy, for
> purposes of equity, than tardy registrants
> with similar claims, presuming the failure to
> register on time was indeed blameless[16]. By

---

[16] Whether each late claimant was "blameless" is considered
with regard to the reasons for the delay and whether the claimant
acted in good faith, below.  Thus, as the Court of Appeals
emphasized in Orthopedic Bone Screw, the four factor equitable
inquiry is required for each claim under the excusable neglect
standard; no single factor is dispositive, including whether the
claimant's own failings caused the delay.

> It also bears noting that while fault does not
> necessarily invalidate a claim of "excusable
> neglect," the analysis applies with equal
> force on the other end of the spectrum - to
> those whose untimely filing was entirely
> faultless. "Excusable neglect," then, is not
> an entirely proper label for the scope of
> inquiry available under its rationale. As the
> Court observed in Pioneer, the "ordinary
> meaning of 'neglect' is 'to give little
> attention or respect' to a matter, or closer
> to the point for our purposes, 'to leave
> undone or unattended to esp[ecially] through
> carelessness.'" [Pioneer Inv. Svcs. v.
> Brunswick Assocs., 507 U.S. 380, 388
> (1993)](citing Webster's Ninth New Collegiate
> Dictionary 791 (1983)) (emphasis in original).
> Thus, even though "neglect" is normally
> perceived negatively to connote carelessness
> in pursuit of a claim, it also "encompasses
> ... simple, faultless omissions to act." Id.
> While "neglect" may not be an apt term to
> describe those situations in which the failure
> to file timely is entirely faultless, the
> principles extracted from the doctrine of

> excluding . . . late registrants from the
> class, the timely registrants would receive
> what is essentially a "windfall," comprised of
> some portion of the recovery that would be
> owed to the otherwise deserving late
> registrants.  As noted in <u>Cendant Prides II</u>,
> the loss of a windfall is not prejudicial. [<u>In
> re Cendant Corp. PRIDES Litig.</u>, 235 F.3d 176,]
> 184 [(3d Cir. 2000)].

<u>Orthopedic Bone Screw</u>, 246 F.3d at 324.

In the <u>Orthopedic Bone Screw</u> case, the Court of Appeals found that the District Court abused its discretion by precluding a late registrant from sharing in the settlement fund in a non-opt-out case.  The claims process in that case required two steps; the appellant completed the first approximately seven months late but the second in a timely manner.  The Court of Appeals found that the appellant's delay constituted excusable neglect and that there was no prejudice to any other claimant because the loss of money that rightly belonged to another legitimate class member could not be considered prejudice.  <u>Id.</u> However, the Court noted that while there were over 100 similarly-situated late claimants, their claims were "minuscule" in comparison with the overall settlement fund and no one could reasonably argue that "the effect of their inclusion is anything but marginal."  <u>Id.</u> at 324.  Thus, even if there could be prejudice from the reduction in the size of a timely claimant's

---

"excusable neglect" apply nonetheless.

<u>Orthopedic Bone Screw</u>, 246 F.3d at 322 n.6.

share of the fund, no prejudice would likely exist on the facts
of that case because the reduction was so small.

As Class Counsel and the Crowell & Moring Plaintiffs point
out, this case is distinct from <u>Orthopedic Bone Screw</u>.  At issue
here are large claims that would distinctly change the share of
the fund that some claimants, notably the Crowell & Moring
Plaintiffs, would recover.  <u>See</u> Ltr. from Austin Cohen to the
Court, Aug. 3. 2007 [Docket Item 336].  According to the Claims
Administrator, allowing all objectors to share in the settlement
funds would reduce the Crowell & Moring Plaintiffs' net recovery
by $1,629,468.63, from $9,811,464.28 to $8,181,995.65, <u>id.</u> at 2,
which would be a reduction of about 16.6% of the recovery
anticipated by the Crowell & Moring Plaintiffs when they
negotiated to rejoin these three settlements.  Further, if the
Court permitted all of the claims filed after February 16, 2006,
the earlier claimants, other than the Crowell & Moring
Plaintiffs, would receive 8.49% of their qualified claims rather
than 11.98%.[17]  <u>Id.</u> at 1; <u>see also</u> Crowell & Moring Br. at 9 n.5
(asserting that permitting all claims filed after February 16,

---

[17]  The supplemental notice had informed class members that
their expected recoveries would be 12 to 15% before attorneys'
fees and costs.  The Court used that estimate in its opinion
approving the settlement.  At oral argument on this motion, Class
Counsel conceded, however, that if the Court permitted all claims
"the settlement still falls within the range of reasonableness,
well within, based on the claims rate recovery."  (Tr. 18:22-24,
May 23, 2007.)  In addition, the prospective reduction in
recovery is overstated because the Court has decided not to
permit all claims, as discussed further below.

2006 would increase value of claims on the fund by 15%). No party has informed the Court what percentage of the Crowell & Moring Plaintiffs' qualified purchases would be reimbursed if the late claims were permitted. Thus, it is not clear whether the loss the Crowell & Moring Plaintiffs will suffer should be called the loss of a "windfall".

Furthermore, unlike the "timely" registrants in <u>Orthopedic Bone Screw</u>, the Crowell & Moring Plaintiffs did not agree to settle this Rule 23(b)(3) action at the same time as all other timely registrants. Rather, the Crowell & Moring Plaintiffs evaluated the share of the fund that would be available to them before deciding whether to opt back in to the settlement.[18] Thus, presumably, they did not bargain for a windfall, but rather for a settlement that was fair considering the other then-existing claims. The value of those claims, indeed, was an integral part of the Court's determination that the settlement class, including the total fund available to meet those claims, should be approved. In addition to the loss of expected

_____

[18]   The late claimants argue that there is no evidence that the Crowell & Moring Plaintiffs relied on a certain share of the fund in deciding to opt back in. The Third Circuit has said, "prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence." <u>In re O'Brien Env. Energy, Inc.</u>, 188 F.3d 116, 127 (3d Cir. 1999). On the other hand, these parties were able to estimate their expected recoveries when deciding to opt back in. The point is not that the Crowell & Moring Plaintiffs had no particular estimation of their monetary recovery; instead, the point is that this subjective expectation is not protected against tardy claims of otherwise worthy claimants.

recovery, the loss of that "flexibility" is another form of
prejudice the Crowell & Moring Plaintiffs allege they would
suffer. (Tr. 31:11-21, June 20, 2007.) It is undeniable that the
universe of completed claims as of February 16, 2006, was a
factor in the consummation of all four settlements, since the
Crowell & Moring Plaintiffs and the Carbone Defendants, as well
as Class Counsel themselves, were able to evaluate the claims
that had been made by that date, nearly four months after the
court-ordered claim date; to this extent, claims filed by
February 16, 2006, gave rise to information in the settlement
renegotiation process that post-February 16, 2006 claims could
not have done.  There is, to be sure, a natural and equitable
distinction to be made between the pre- and post-February 16th
claims, as Class Counsel proposes in this motion.  The more
difficult issue is whether all post-February 16th claims should
be excluded as untimely.

Turning to the post-February 16th claims, the Court finds
that despite the significant value of the late claims, there is
no fatal prejudice as that term is defined in Orthopedic Bone
Screw with regard to the mere diminution of the expected recovery
of the earlier claimants.  First, it is important to note that
the only alleged prejudice is prejudice to the Crowell & Moring
Plaintiffs, who did not participate in the Carbone settlement.
Thus, there is no prejudice with regard to the late claims on

24

funds from that settlement.

Second, at the time the Crowell & Moring Plaintiffs entered the Morgan, Schunk and SGL settlements they knew those settlements provided fixed funds and that other claimants might be permitted to come along and lay claim to those funds, under prevailing Third Circuit law.  Class Counsel conceded at much at oral argument.  "It's not uncommon in class action cases for late claims to be filed.  And it's not uncommon for the district court to allow late filed claims particularly in light of the Orthopedic Bone Screw decision."  (Tr. 16:5-8, May 23, 2007.)  Although Class Counsel then tries to argue that in this case it was reasonable for the parties to rely on the number of claims submitted by February 2006, the facts indicate that the estimate of those claims was not reasonable if it failed to account for the prospect of late claims, and Class Counsel's concession at argument weighs against the Court adopting such a determination.  The Court cannot find prejudice merely because, contrary to the facts of this case and the law of this Circuit, the parties assumed qualified late claimants  - who had begun to come forward and of which some of them were aware  - would not have access to the settlement.

Third, the Court has an obligation not to elevate the claims of any class member over the claims of other class members, no matter how large a class member's stake in the case might be.

25

All legitimate class members should, if equitable, be permitted
to share in the settlement.  Relatedly, the Court cannot elevate
the privilege it gave to Crowell & Moring to opt back into the
three settlements into an expectation that trumps the rights of
other class members.  Indeed, the Court permitted Crowell &
Moring to reenter the settlement only after finding that "no
special advantage [was] conferred upon the Crowell & Moring
Plaintiffs through this procedural development of opting out and
then opting back in."  In re Elec. Carbon Prods. Antitrust
Litig., 447 F. Supp. 2d at 397.  Thus, while the Court
appreciates the diligent efforts of Class Counsel and the Crowell
& Moring Plaintiffs to secure a fair settlement in this matter,
the Court cannot compensate these parties for their efforts by
diminishing the value of the legitimate claims others may have on
the settlement funds.  See id., ("the Court must scrutinize the
decision to assure that no special benefit is conferred upon [the
Crowell & Moring Plaintiffs] at the expense of the other class
members").

        Fourth, as discussed below, prior to February 16, 2006,
several claimants had submitted blank claim forms and many others
had direct communications with the Claims Administrator about
their forthcoming claims.  The Administrator encouraged these
parties to file late claims.  Thus, Class Counsel and the
Administrator were on notice at the time Crowell & Moring

rejoined the settlement that additional claims were imminent. Additionally, the claimants' purchase information was in the possession of Defendants with whom the Crowell & Moring Plaintiffs were negotiating.  Class Counsel informed the Court that the Crowell & Moring Plaintiffs were continually updated about the status of claims on the fund.  (Tr. at 11:3-6, May 23, 2007) ("there was a continuing flow of estimates of recoveries but by the time Crowell & Moring entered into its settlement agreement about February 11th with Morgan, it had a reasonable expectation of what the claims would be.").  Crowell & Moring indicated, however, that although they received data from Defendants and Class Counsel, they were not made aware that blank forms had been filed (Tr. at 21:8-11, May 23, 2007), even though it is clear that the Settlement Administrator was communicating with late claimants about substantiating their claims.  Moreover, the Court was not informed by Class Counsel or any other party that the filing of claims was continuing to occur even at the time of the final class action settlement approval hearing in May 2006.  The failure of these parties to disclose any of this information - to Crowell & Moring or the Court - should not be laid at the feet of late claimants, who invested resources in compiling their claims after receiving assurances from the Administrator that they should do so (but subject to court approval of late claims).  Better communication between the

27

parties now seeking to exclude the late claimants could have avoided this prolonged motion practice and, frankly, headache for all concerned.

Fifth, in evaluating prejudice, the Court looks also at the costs incurred by the late claimants - those who made qualifying purchases - who were encouraged by the Administrator to use their resources to file and document their claims.  That time and expense and the alleged antitrust loss they suffered is also part of the equitable analysis.  While Crowell & Moring's consistent participation in the settlement negotiations made three of the settlements possible, the antitrust loss they suffered is no more real than the loss suffered by the late claimants.  The Court cannot ignore that the late claimants would recover nothing for that loss if the Court approved this motion for distribution and adopted Crowell & Moring's position.

Finally, courts analyzing excusable neglect for prejudice must account for "more than whether the Plan set aside money to pay the claim at issue.  Otherwise, 'virtually all late filings would be condemned by this factor.'"  In re O'Brien Env. Energy, Inc., 188 F.3d 116, 126 (3d Cir. 1999) (quoting Manousoff v. Macy's Northeast, Inc., 166 B.R. 799, 802 (S.D.N.Y. 1994)).  Although this settlement included additional money to compensate late claimants, approximately $200,000, that additional money is significantly less than the value of the disputed claims.  Yet,

O'Brien teaches that the failure to anticipate what late claims
would materialize does not constitute prejudice.

For all those reasons, the Court finds that there is
insufficient prejudice to justify completely excluding all late
claimants as a group.  Although the considerations in this case
are unique because of the phase at which the Crowell & Moring
Plaintiffs reentered the litigation and because the Court then
determined that the settlement was fair based in part on the
share each class member might receive from the settlement, the
reduction in likely recovery remains fair to all claimants.
Permitting those valid claimants who through excusable neglect
filed and/or substantiated their claims after February 16, 2006
would not prejudice other claimants.  The Court notes also that
although the Crowell & Moring Plaintiffs protest their reduction
in recovery, they do not argue that they would not have settled
had they known of this level of recovery nor do they seek to be
released from their settlement at this date.  Thus, apparently,
the level of perceived harm is not so great, even to them.[19]

Therefore, the Court must analyze the other equitable

───────────

[19]   It is important to note that this inquiry usually asks
whether permitting late claimants would prejudice timely
claimants and that no party asks for that precise analysis here
because the only parties claiming prejudice, the Crowell & Moring
plaintiffs, themselves were permitted to file their claims beyond
the original Court-ordered cut-off dates for doing so.  In the
context of this case, the most equitable thing to do is to permit
all qualified claimants access to the fund instead of precluding
the later ones, so long as excusable neglect is shown by the late
claimants.

factors to determine which late claims shall be permitted, namely
length of delay and its effect on the proceedings, reasons for
delay, and whether claimant acted in good faith, for each
claimant.

   2.   Length of Delay and Effect on Judicial Proceedings

   The next equitable factor for the Court to consider in
determining whether to permit the objecting claimants to share in
the settlement fund is the length of their delay and its effect
on the judicial proceedings.  Considering that the settlement
funds could not be distributed until the Crowell & Moring
Plaintiffs substantiated their claims, there only some
incremental delay on the judicial proceedings.[20]

   Measuring the delay from the time the Crowell & Moring
Plaintiffs submitted proofs of claim, hardly any of the claims
are untimely and at most some claimants filed one month late.
However, even if the Court used the February 17 date, the date
the Crowell & Moring Plaintiffs sought to opt back in, most of

_____

   [20]  While the process of deciding the motion for approval of
a plan of distribution has been a lengthy one, the Court cannot
fault the late claimants for all of that time.  Indeed, at oral
argument, some errors of others came to light, as is bound to
happen in the administration of a large settlement fund on which
numerous claims are made.
   Nonetheless, conduct such as the filing of blank forms and
failure to supply documentation in a prompt fashion distinguished
the post-February 16, 2006 claimants from the earlier ones who
had completed their proofs of claim and could be audited by the
Administrator.  Although the Settlement Administrator did not
close the door to claims perfected long after the deadline, it is
clear that these belated and incomplete submissions slowed the
process to the detriment of the pre-February 16, 2006 claimants.

the claims were filed within a month and a half of that date and
thus would not have a substantial impact on the date of
distribution of the funds, given the time likely necessary to
audit and process the large number of the Crowell & Moring
Plaintiffs' purchases.  Cf. In re Cendant Corp. PRIDES Litig.,
235 F.3d 176, 183 (3d Cir. 2000) (three to five day delay in
filing claim was insignificant as matter of law because "these
few days could not have had any real impact on the judicial
proceedings.")  Although the delays here were longer than a few
days, there has been no showing that accepting them when filed
would have impacted the litigation in any way.  All the claimants
filed their claims by the time the Court approved the class
settlement in August 2006, as described in the chart below:

| Claimant | Date of Documented Claim | Purchases Claimed |
|---|---|---|
| Chicago Transit Authority | May 3, 2006 | $1,478,843 |
| *Original Class Action Refund Claimants* | | |
| Mahaffey's Electric Motor Repair | March 12, 2006 | $105,197.41 |
| Kidd Machine & Manufacturing Company | March 14, 2006 | $15, 285.70 |
| Warfield Electric Company, Inc | March 12, 2006 | $776, 517.17 |
| Flex-Tech Integrated Supplier | March 12, 2006 | $10,685.00 |

| Claimant | Date of Documented Claim | Purchases Claimed |
|---|---|---|
| Phelps Dodge High Performance Conductor | March 15, 2006 | $520,965.68 |
| Becker Bros. | April 10, 2006 | $60,098.78 |
| Aetna Manufacturing Company | March 13, 2006 | $11,754.74 |
| Aero Accessories, Inc. | March 14, 2006 | $4,340,201.95 (compromised to $1,272,435.17 if approved) |
| Milwaukee Electric Tool Corporation | March 11, 2006 | $2,923,990.37 |
| Prestolite Electric, Inc. | March 14, 2006 | $6,986,745.19 |
| Zeller Electric Company, Inc. | March 11, 2006 | $22,444.71 |
| KBZ Electric, Inc. | March 11, 2006 | $20,706.51 |
| Crown Industrial Supply Division of Steiner Electric Company | March 21, 2006 | $27,599.75 |
| Beltline Electric Motor Repair, Inc. | March 14, 2006 | $17,183.86 |
| *The New CAR 25* | | |
| Hudson-Sharp Machine Co. | March 15, 2006 | $9,650 |
| Consultex Systems Inc. | March 15, 2006 | $110,743 |
| Machinery Components | March 15, 2006 | $526,983 |
| Hydro-Egroseal | March 15, 2006 | $195,274 |

| Claimant | Date of Documented Claim | Purchases Claimed |
|---|---|---|
| Southern Electric Motor | March 15, 2006 | $22,286 |
| Iowa Interstate Railroad | March 15, 2006 | $33,625 |
| Koontz Wagner Electric | March 15, 2006 | $73,338 |
| Conbraco | March 15, 2006 | $281,112 |
| Master Motor Rebuilders | March 15, 2006 | $236,805 |
| Phoenix Sales and Services | March 15, 2006 | $272,579 |
| ABC Bus Companies | March 15, 2006 | $51,761.59 |
| JMC Products | March 15, 2006 | $209,132 |
| United Knitting Machine Co. | March 15, 2006 | $1,015,050 |
| KBM Industrial Inc | March 15, 2006 | $77,724 |
| Ward Leonard Electric | March 15, 2006 | $180,408 |
| Alstom Transportation | March 15, 2006 | $12,189 |
| Modern Motor Industries | March 15, 2006 | $291,848 |
| World Wide Equipment | March 15, 2006 | $4,358 |
| JCH Enterprises, Inc. | March 15, 2006 | $94,747 |
| Miraj | March 15, 2006 | $10,852,999 (compromised to $82,648 if approved) |
| Ventura County RR | March 15, 2006 | $9,600 |
| Toledo, Peoria & Western Railroad | March 15, 2006 | $192,000 |

| Claimant | Date of Documented Claim | Purchases Claimed |
|---|---|---|
| Arizona & California Railroad | March 15, 2006 | $96,000 |
| Kyle Railroad | March 15, 2006 | $259,200 |
| Indiana & Ohio RR | March 15, 2006 | $345,600 |
| *Lex Recovery Group* | | |
| Flowserve | April 13, 2006 (additional docs requested and supplied in Nov. 2006) | $28,280,588 |
| Arkansas General Industries | March 3, 2006 | $385,000 |
| Electrical Insulation Supply ("EIS") | February 22, 2006 | $11,061,704.37 |

As for the effect delayed claims may have on the distribution, the necessity of adjudicating these late-claims issues has added months of delay to the proposed distribution.[21] If the Court approves a plan of distribution, the case will be completely terminated.  The Court must be permitted the necessary time to rule on Class Counsel's motion, which would exclude substantial claims from this large recovery in a complex multidistrict settlement; this time and care are not factors

---

[21]  Class Counsel argued that poor documentation delayed processing of claims, but there is no argument that now permitting the late claims would further delay the distribution or litigation in any way.

directly attributable to the timing of the objectors' claims.

However, the Court is aware that, in a practical sense, the late filings caused delays because had they been filed and documented before October 25, 2005, or even before February 17, 2006, there would have been much less confusion about the claims on the fund at the time the Crowell & Moring Plaintiffs opted back in and this lengthy period of late-claims motion practice would have been unnecessary.

         3.  <u>Reasons for the Delay</u>

A late claimant is required to state its reasons for delay. Because several claimants provide different justifications for their delays, those justifications will be analyzed separately. However, no party argues that the notice provided to the class was constitutionally insufficient or failed to comply with the notice requirements of Rule 23(e), Fed. R. Civ. P.  The Court will carefully assess the reasons for delay advanced by each claimant.

         a.  *Chicago Transit Authority*

The Chicago Transit Authority ("CTA") filed its claim on May 3, 2006.  The CTA claims, and the Court is satisfied, that the delay was through no fault of its own.  CTA argues that, therefore, it must be deemed excusable neglect.

Apparently CTA did not receive actual notice of the settlement because notice to it was "misaddressed."  That is, by

the time the notices were mailed, the Authority had moved to a
new building.  Class Counsel argued that its notice was
sufficient and was not returned to the Claims Administrator, but
conceded that the notice was not mailed to CTA's attorney of
record.  CTA also affirmed that it did not see the public notice
in the Wall Street Journal, which the Court had ordered when
approving the settlement.  Although CTA makes no argument that
the notice failed to satisfy due process, its rendition of events
makes clear that the reason for delay was not within its control.

Further, CTA apparently mailed a letter to the Settlement
Administrator on February 8, 2006, once the Authority became
aware of the settlement in this case.  The Administrator
encouraged CTA to gather its documentation and file its claim,
which it did on May 3, 2006.  Thus, although several months
passed, there is no allegation that CTA was anything other than
diligent in seeking the recovery to which it was entitled.  See
In re Cendant Corp. PRIDES Litig., 235 F.3d at 184 (finding
excusable neglect when claim was late due to claimant's own
mailroom error but there was no indication it acted in bad
faith).  Further, all parties were on notice prior to the
settlement that CTA's claim would be forthcoming.  For all these
reasons, this factor weighs in favor of permitting CTA's late
claim.

36

b.    *The Class Action Refund ("CAR") Claimants*

The original group of Class Action Refund Claimants argue that they did not file "late" claims because they all[22] submitted proof of claim forms before February 16 and just submitted their supporting documentation approximately one month later. Alternatively, they argue that the low timely participation of class members indicates that the notice was either imperfect or not fully appreciated when received by these claimants.  While they present no individual reasons for their delays, these claimants seem to argue that the "reason" for their delay must be the same reason so many others failed to submit claims.

The CAR claimants also argue that Class Counsel's willingness to obliterate the court-imposed deadline for some claimants and not others is arbitrary, depending only upon the February 16, 2006 date, given that all claimants are legitimate class members and that denial of their claims would deprive them of all recovery; whereas the only potential harm to the Crowell & Moring Plaintiffs is a reduction in their alleged expected share of recovery, to which they should have no guarantee.  The new CAR 25 do not make any additional arguments to explain their delays.

A late claimant must explain the reasons for its delay when invoking the Court's equitable power; without such factual

------

[22]   However, CAR certifies, Crown Industrial did not file even its blank form until February 20, 2006.  (Del Gatto Aff. at 2-3, Mar. 2, 2007.)

reasons, a court is unable to weigh the claimant's justification and good faith as required by Third Circuit precedent.  See Orthopedic Bone Screw, 246 F.3d at 326-29; Cendant Corp. PRIDES Litig., 235 F.3d at 183-84.

Although CAR has provided the Court with extensive information regarding its communications with the Claims Administrator and the efforts it made to document its clients' claims, it has provided the Court with no justification for the delay in filing claims beyond the Court's deadline or after February 16.  There is no evidence showing whether they acted willfully or inadvertently.  In this equitable inquiry, each late claimant is required to come forward with some explanation for its delay.  Otherwise, the Court is unable to assess that the claimants' delay justifies equitable treatment.  On the record here, it is just as likely that the delay was caused by bad faith or an economic assessment that documenting the claims was too costly.  Those reasons would of course weigh against equitably extending the Court's deadlines to permit the CAR claimants to share in the fund.  Cf. Coltec Industries, Inc. v. Hobgood, 280 F.3d 262, 273 (3d Cir. 2002) (if decision is voluntary and strategic, that weighs against equitable relief under Rule 60(b)).

At oral argument the Court had ample discussion with counsel for CAR about the necessity for documenting specific reasons for

38

delay.  The Court asked counsel for information explaining the
delay of these claimants and notified counsel that the Court
remained unaware "why they were late." (Tr. 80:13, June 20,
2007.)  The Court also urged CAR that it was CAR's "burden to
demonstrate excusable neglect because it is a late claim."  (Tr.
81:9-10, June 20, 2007.)  Counsel did not object to that
characterization of the burden and agreed to submit additional
documentation (id. at 80-81), which it did on July 3, 2007
[Docket Items 329 and 330].  Even without such prompting, CAR, as
a class-action claims service with experience in submitting
claims upon settlement funds for clients, should be aware of the
necessity for explaining each claimant's reasons for delay or
other non-compliance with the court-ordered claims process.
However the documentation CAR submitted, affidavits from a CAR
employee, failed to address the reason for the initial delay by
the claimants in filing claims.  The affidavits only address
whether the claimed purchases qualify as electrical carbon
products and the process for substantiating the claims, thus
leaving the Court without any explanation for the failure of the
CAR claimants to file claims on time, or at least by February 16.
At the subsequent continuation of oral argument, counsel declined
to revisit the issue, noting only "we don't intend to present any
more argument on [timeliness] here today, we would rest on the
arguments that we've previously made."  (Tr. 5:22-24, Aug. 2,

2007.)

In the absence of any explanation why the claimants did not timely file claims, this factor weighs heavily against all the CAR claimants.  It is impossible to make an equitable determination regarding the late claims of the CAR claimants without some evidence from the claimants that good reasons existed for their actions or failures to act.

c.  *Flowserve[23] Corporation*

Flowserve indicates that it was unaware of the Class Settlement until an employee discovered it on the Claims Administrator's website in February 2006.  (Roberts Aff., March 15, 2007 at ¶ 4.) The Vice-President for Global Litigation at Flowserve immediately contacted the Claims Administrator, on February 15, 2006, and the Administrator advised Flowserve that it could still file a claim, but that the Court would have to determine whether to permit late claims. (Id. at ¶ 4, id. at Ex. 1.) Flowserve then worked to document its claim, which it submitted with purchasing information on April 13, 2006, setting forth more than $28 million in claims. (Id. at ¶ 6, Docket Item 285 at 5-6.)

It appears that the notice to Flowserve did not come to the

---

[23] Flowserve's claims are in part based on the claims of its subsidiaries, which were assigned to Flowserve. The Court has already ruled that Flowserve has standing to seek recovery for the qualified purchases by these subsidiaries, Durametallic, Pac Seal, BW Seals, Pacific Wietz and 5 Star Seal Corp..

attention of those who could understand and act on it[24] because
the mailed settlement notice was sent to Flowserve's operations
plant in Kalamazoo, Michigan, rather than to its corporate
headquarters or legal offices, which are located in Irving,
Texas.  (Roberts Aff., May 30, 2007 at ¶ 3.)  Flowserve informed
the Court that in Kalamzoo, it has only a seal manufacturing
facility and the managers there are manufacturing and operations
managers who likely did not know what to do with such notice if
they received it.  (Id. at ¶¶ 3-4.)  In addition, the notice of
settlement might have been misinterpreted by a lay person because
it did not obviously refer to Flowserve's seal manufacturing
business.  (Id.)  The notice, of course, refers instead to
electrical carbon products.  The Flow Solutions Division that
operates the plant in Kalamazoo does not purchase electrical
carbon products as they are commonly defined, but only mechanical
carbon products for the manufacture of seals, which were,
however, included in the legal definition of electrical carbon
products in this case. (Id. at ¶ 4).

    After Flowserve learned of the settlement, Patrick Nolan,
the Supply Chain Manager of the Fluid Sealing Division, "spent
approximately 20 hours reconstructing the purchasing history of
carbon products by the five entities[, which Flowserve acquired,

---

    [24]  There is no argument that notice was constitutionally
deficient.  Rather, the parties describe the notice issue to
explain the reasons for the delay.

that] would have purchased such products ... for 1990 through
1999, the ten years that constituted the class period." (Id. at
¶ 5).  On November 3, 2006, the Claims Administrator requested
additional documentation from Flowserve, which it sent on
November 21 and 22, 2006.

> Documenting the claim (as requested by the
> Claims Administrator) required Flowserve to
> hire two temporary employees for two weeks to
> review approximately 60 boxes of invoices and
> supporting documents for the relevant
> companies in the applicable period.  This
> research further required the full-time
> efforts of one member of the accounting staff
> for two weeks, and approximately half the time
> of two Flowserve interns for two weeks.  As a
> result of this research, Flowserve produced
> several thousand pages of invoices . . . to
> the Claims Administrator.

(Id.)

The record shows that once it became aware of the settlement
in February 2006, Flowserve worked diligently to document its
qualifying purchases.  Robert Roberts, a lawyer for Flowserve,
contacted the Claims Administrator in mid-February 2006 when he
learned about the settlement.  (Id. at ¶ 6.)  The Administrator
advised him that Flowserve could still fille a claim and gave no
indication that February 16 would be proposed as a cut-off date
or that an estimate of its claim would be useful to the parties
at that point.  Nor did anyone advise Flowserve that the Crowell
& Moring Plaintiffs had an April 5 filing date.  (Id.)
On December 14, 2006, the Administrator informed Flowserve that

42

its documentation supported its claim for approximately $28 million in qualifying purchases and so no additional documentation was required.[25]

Flowserve has provided ample evidence that its delay was due to inadvertence or mistake.  The circumstances of its initial delay are understandable given the locus to which the notice of proposed settlement was sent in Kalamazoo.  Further, Flowserve has shown diligence in documenting its claims since learning of the settlement.  There was good cause for the delay and the Administrator was on notice in February 2006 that the claim was forthcoming.  Thus, Flowserve's reasons for delay weigh in favor of finding excusable neglect and permitting its claim.

      d.   *Arkansas General Industries*

Arkansas General Industries ("AGI") went out of business in February 2002.  (Connor Aff. at ¶ 4) [Docket Item 287].  The purchaser of AGI's assets did not purchase the right to the claims at issue in this case.  (Id. at ¶ 5.)  When it went out of business, AGI ceased to have a place of business in Arkansas, where the notice of settlement was mailed.  (Id. at ¶ 7.) The business that purchased its assets now operates at that address and periodically forwards AGI mail to Mr. Connor in Chicago. (Id. at ¶ 9.)  Mr. Connor and AGI first received notice of the

---

    [25]  Flowserve does not contest the Administrator's determination, after an audit, that Flowserve made $25,767,827.69 in qualified purchases.  (Roberts Aff., May 30, 2007 at ¶ 7.)

43

settlement in this litigation in late November or early December 2005, after the court-ordered deadline for filing claims. (Id. at ¶ 10.)

Mr. Connor then promptly contacted Lex Recovery Group, a company that facilitates settlement claims, and Lex contacted the Claims Administrator to determine if AGI could still submit a claim. (Id. at ¶ 11.) When the Claims Administrator said that AGI could submit its claim, Mr. Connor contacted the purchaser of AGI's assets to begin gathering records of AGI's relevant electrical carbon products purchases. (Id. at ¶ 12.) Mr. Connor followed up on December 20, 2005. (Id.) In February 2006, Mr. Connor received the original invoices documenting purchases by AGI from Carbone of America and submitted them with its claim in March 2006. (Id. at ¶¶ 13-14.)

AGI has amply explained its good reasons for delay. There is no indication of unnecessary delay, bad faith, or lack of diligence. Therefore, this factor weighs in favor of finding excusable neglect.[26]

e.   *Electric Insulation Supply, Inc. ("EIS")*

EIS indicates that it was unaware of the settlement until a

---

[26]   More importantly, no party argues that there is any reason to exclude AGI. Because AGI's claim only goes to the Carbone settlement, which does not affect the Crowell & Moring Plaintiffs who never opted back in to that settlement, no party is arguing that accepting AGI's claim would cause prejudice.

claims-processing company, Lex Recovery, contacted EIS on January 30, 2006.  (Kishish Aff., March 15, 2007, at ¶ 5.)  There is no indication that the mailed settlement notice was not received by EIS, nor whether anyone at EIS saw the published notice, or what accounted for its initial failure to submit a claim.  After Lex contacted EIS, the two worked together and submitted a claim form with supporting documentation on February 22, 2006. (Id. at ¶¶6-7.)  Although it appears that EIS worked diligently to document the claim once LEX got involved in the process, EIS has not provided the Court with any explanation for its initial delay in submitting that claim.  As with the CAR claimants, EIS has not provided this Court with any basis for finding neglect was excusable with regard to the reasons for the delay.  Therefore, this factor weighs against permitting EIS to make a late claim on the fund, despite its relatively short delay.

    4.   <u>Whether Claimant Acted in Good Faith</u>

The final equitable factor to consider is whether the claimant acted in good faith. "Given the equitable nature of our inquiry, it is of course true that the [claimant] must demonstrate good faith or otherwise seek the relief of the court with clean hands."  <u>Orthopedic Bone Screw</u>, 246 F.3d at 329.

After the October 2005 deadline but before the proposed February 16, 2006 cut-off, the Class Action Refund (CAR) claimants filed claim forms that contained no listing of any

purchases.  (See Ex. D to Supp. Aff. of Settlement Admins.; Supp.
Aff. of Settlement Admins. ¶ 11.)  The forms contained no
estimate of purchases and no indication from which Defendant they
may have been made.  Class Counsel and the Crowell & Moring
Plaintiffs argue that this shows the claimants purposely ignored
applicable deadlines, sought to unilaterally grant themselves an
extension, and therefore came to the Court with unclean hands.

    While the Court agrees with Class Counsel that these claims
should not be deemed filed until the date the information on
purchases was submitted, the Court does not find that the earlier
filing of blank forms shows a lack of good faith.  It is
certainly understandable and likely that a claimant would become
aware of its class membership before it was able to calculate its
claims.  The fact that these claimants attempted to notify the
Administrator that claims would be forthcoming by filing blank
forms, instead of waiting until all the information was gathered,
does not appear to be an act of bad faith.  Further, the
Administrator processed the claims when supplemented with the
required information.  Therefore, the fact that these claimants
first filed blank forms is irrelevant – both in calculating their
filing date and in determining whether they acted in good faith.

    However, CAR does not appear to have made any good faith
attempt to discover why its claimants delayed well beyond the
October 2005 deadline.  Nor has EIS apparently done this

investigation into its own actions.  Or, if they have, they have not explained their actions to the Court.  Thus, there is no basis for finding that they acted in good faith and this factor weighs against them.

Because there is no other argument that any other claimant acted in bad faith, and their explanations tend to show that the other claimants did not, this factor weighs in favor of all other late claimants.

### C.    Claimants Who Completely Failed to Explain their Delays Shall be Barred

Having determined which factors weigh for and against finding excusable neglect, the Court finds that, on balance, the delay by the following claimants was excusable:

- Chicago Transit Authority;
- Flowserve; and
- Arkansas General Industries

There is no argument that CTA or AGI's participation in the fund would prejudice anyone.  As for Flowserve, though its claim is large and will reduce the claim of others, the Court does not find this to be the type of prejudice that should equitably weight against any recovery by Flowserve, in light of the facts of this case.  Flowserve is as worthy a participant as any timely claimant, and it has demonstrated that it acted promptly to perfect its claim as soon as it became aware of the settlement process.  Further, all three claimants have shown the reasons for their delays and that they acted with diligence and in good faith

47

once they became aware of the settlement.  Permitting their
participation now would not create any further delay.  On the
other hand, like all claimants discussed above, these claimants
filed their claims well after the court-ordered deadline.
Nevertheless, on balance, the Court finds that the equities favor
permitting them to share in the settlement funds.

On the other hand, because the CAR Claimants and EIS have
failed to provide the Court with any explanation why their claims
were delayed, the Court cannot determine that their delays
constitute excusable neglect.  Notably, the Court cannot make any
equitable determinations regarding the reasons for the delays and
whether these claimants acted in bad faith.  Moreover, this
cluster of late claimants, although represented by experienced
claims recovery services, failed to account for their lateness.
Therefore, the Court shall grant Class Counsel's motion insofar
as it seeks to exclude the claims of the CAR Claimants and EIS.

As counsel for CAR noted, many of the CAR claims were for
small amounts of money.  The claimants apparently engaged claims
recovery services to do their claims-processing work for them
more efficiently than they could have done individually.[27]  That

---

[27]  For example, CAR's counsel characterized these
claimants as "smaller companies," who "have very small amounts at
stake, and if they didn't have somebody who was presenting their
claims here, their claims probably wouldn't have been included .
. . ."  (Tr. 22:1-4, Aug. 2, 2007.)
    Additionally, at oral argument on whether Crown Industrial
and Beltine purchased qualified electrical carbon products,
counsel conceded "those were very small claims, $27,000 and

is acceptable.  However, that work, where the claims are filed
belatedly, includes showing that equitable considerations merit
this Court's permission of those claims because there was
excusable neglect by each class member that CAR purports to
represent.  This was not done despite the Court's invitation and
the requirements of precedent, as discussed above.  In the
absence of even an attempt to make such a showing by
investigating the reason for the delays, the equities weigh in
favor of barring these claims.  In that instance, the claimants
have simply failed to lay any persuasive ground for equitable
relief and this Court shall grant none to them.

### D.   Whether Claims Were Adequately Documented

Class Counsel originally argued that seven other claimants
who submitted claims before February 17, 2006 should be
prohibited from sharing in the class settlement for failure to
provide required documentation to support their claims.  These
claimants are Mutli-Duti Manufacturing, Illinois Electric Works,
B&B Electronics, Danmar Industries, Associated Electro Mechanics,
Texas Compressor Corp., and Huntington Electric Motor Service.
The Claims Administrator had sent letters requesting
documentation from them on October 15, 2006.  These claimants

---

$17,000, and the documentation, any additional documentation that
would have been necessary would have been more expensive to find
it than it would have been to get the claims, so they have just
asked to stand on what they submitted, at this point."  (Tr.
15:16-21, Aug. 2, 2007.)

apparently informed the Administrator that they never received those letters and eventually provided some documentation to support their claims.  (White & Hamer Aff., Apr. 2, 2007, ¶¶ 6-9.)  Ultimately, the Claims Administrator was able to audit the files of the settling defendants and determine the amount of five of these claimants' purchases and that two (Danmar and Texas Compressor) did not make qualified purchases.  None of these claimants has appeared in this action or interposed any objection to the proposed plan of distribution.

Because Class Counsel was able to audit Defendants' files to determine what qualified purchases these claimants made, Class Counsel alternatively asks the Court to approve this requested amount, listed in Exhibit C to the April 2, 2007 Supplemental Affidavit of the Settlement Administrators and totaling approximately $600,000.  That outcome appears fairest to the Court.  The sales purchases from Defendants' records were apparently relied on throughout the claims process to audit claims.  There has been no distribution of funds such that paying this claim could disrupt the process.  Further, these claims were not late claims; rather, additional documentation was required after they were timely filed.  There has been no objection to paying these claims and the claimants have not appeared in this proceeding to object to payment in these amounts.  Therefore, the Court shall grant the motion insofar as it seeks to pay these six

claimants in the amounts reflected in Exhibit C to the April 2, 2007 White & Hamer affidavit.  Because the audit has determined that Danmar Industries and Texas Compressor Corp. did not make qualified purchases and there has been no objection to excluding them, the Court shall approve that determination by the Administrator.

## IV.  CONCLUSION

The Court grants the motion for approval of a plan of distribution in part and denies it in part.  The disputed claims are resolved as follows:

| Claimant | Qualified Purchases |
|---|---|
| Flowserve | $25,767,827.69 |
| Chicago Transit Authority | $ 1,478,843.00 |
| Arkansas General Industries | $   385,000.00 |
| Multi-Duti Manufacturing | $    82,343.00 |
| Illinois Electric Works | $     2,440.00 |
| B&B Electronics | $    84,239.00 |
| Associated Electro Mechanics | $    72,482.00 |
| Huntington Electric Motor Service | $   359,647.00 |

| | |
|---|---|
| **CAR Claimants:**<br>Mahaffey's Electric Motor Repair; Kidd Machine & Manufacturing Co.; Warfield Electric Company; Flex-Tech Integrated Supplier; Phelps Dodge High Performance Conductor; Border Industrial Motors; Aetna Manufacturing Co.; Becker Bros.; Aero Accessories, Inc.; Milwaukee Electric Tool Corp.; Prestolite Electric, Inc.; Zeller Electric Co., Inc.; KBZ Electric, Inc.; Crown Industrial Supply Division of Steiner Electric Co.; Beltline Electric Motor Repair, Inc.;Hudson-Sharp Machine Co.; Consultex Systems Inc.; Machinery Components Inc.; Hydro-Egroseal Inc.; Southern Electric Motor Inc.; Iowa Interstate Railroad; Koontz Wagner Electric Co.; Conbraco; Master Motor Rebuilders Inc.; Ventura County Railroad; Toledo, Peoria & Western Railroad Corp.; Arizona & California Railroad; Kyle Railroad; Indiana & Ohio Railway Co.; Phoenix Sales & Services; ABC Bus Companies, Inc.; JMC Products Inc.; United Knitting Machine Co. Inc.; KBM Industrial Inc.; Ward Leonard Electric Co.; Alstom Transportation Inc; Miraj Specialties Corp.; Modern Motor Industries; World Wide Equipment; and JCH Enterprises | 0 |
| Electrical Insulation Supply, Inc. | 0 |
| Danmar Industries | 0 |
| Texas Compressor Corp. | 0 |
| **TOTAL** | **$28,232,821.69** |

The total of these disputed claims, which were not recommended for approval by Class Counsel but which have been approved by the Court for excusable neglect, is $28,232,821.69. Class Counsel recommended approval of allowed purchases in the amount of $378,002,266.56, to which no entity had raised an objection. Adding these new allowed purchases of $28.2 million

to the previously allowed purchases of $378.0 million yields a total of approximately $406.2 million.  The new allowed purchases represent only 6.94% of the total.  Approved qualified purchases are used as the basis for the pro rata distribution of the settlement funds.  Thus, the Court's approval of these contested claims diminishes the typical earlier claimant's share of recovery by 6.94% from what was projected when the Court approved the settlement in August 2006.  The overall settlement remains an excellent value from the standpoint of the class members.

The claims allowed shall be paid on a pro-rata basis from the settlement funds to which they apply.  Within twenty (20) days, the Settlement Administrator shall submit for this Court's approval an amended plan of distribution, consistent with this Opinion, containing estimated pro-rata distributions.

**December 27, 2007**                    **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          U.S. District Judge

53